## Case No. 2,315.

### In re CALIFORNIA PAC. R. CO.

[3 Sawy. 240; 11 N. B. R. 193; 2 Cent. Law J. 79.] [1]

District Court, D. California. Dec. 18, 1874.

BANKRUPT ACT APPLICABLE TO RAILROAD COMPANIES.

1. The question of the constitutionality of the provisions of the bankrupt act which apply to persons other than merchants and traders is not longer open to discussion.

2. It has never been decided that a "law on the subject of bankruptcy," within the meaning of the constitution, must provide for the discharge of all persons subject to its provisions.

3. Railroad corporations are comprehended within the words "moneyed business or commercial corporations."

4. The court has authority to inquire into the value of securities held by creditors of the alleged bankrupt, in order to ascertain whether the debts due the petitioning creditors are of the amount required by the act as amended—and that a secured creditor has a provable debt within the meaning of the act.

[Followed in Re Broich, Case No. 1,921. Approved in Re Crossette, Id. 3,435. Cited in Re Bouton, Id. 1,706.]

5. The act declares that the word "person" shall include corporations, and service is therefore to be made personally on a corporation by delivering a copy of the petition and order to show cause to its head or principal officers, and the "usual place of abode" must be construed to mean the principal place of business where alone it can be said to reside.

6. There is no provision of law, authority, or precedent, which requires that the authority under which an agent of the petitioning creditors, acts, should be set forth; the amended act provides that there need only be five signers, and allows both the signing and the verification to be done by an agent, when the first five signers, or any of them, are absent.

7. By the sworn statements of the agent, as contained in the two petitions, it appears that one-third of the creditors have not united in the petition for an adjudication. The court is at liberty to examine the petition for an injunction, inasmuch as it might have been incorporated in the petition for an adjudication, and come to a conclusion on the facts therein stated, even though the petition for adjudication contains an explicit and positive averment that the debts due the petitioners amount to at least one-third of all the debts provable against the debtor.

[Cited in Re McKibben, Case No. 8,859.]

8. A debtor ought not to be compelled to file a full list of his creditors, when it appears from the sworn statements of the petitioning creditors that the requisite amount and number have not petitioned.

9. Petitioning creditors allowed ten days further time, in which to obtain the consent of others to join in the petition.

In bankruptcy.

H. H. Haight and George Cadwalader, for petitioner.

S. W. Sanderson, Robert Robinson, Samuel M. Wilson, John B. Felton, and McAllisters & Bergin, for respondent.

HOFFMAN, District Judge. A petition having been filed praying that the above corporation be adjudged a bankrupt, it appeared specially and under protest, and through its counsel moved that the proceeding be dismissed on various grounds particularly set forth in the exceptions on file. The cause has been argued at very great length, and with a zeal and ingenuity proportioned to the magnitude of the interests and the importance of the questions involved in its determination.

First. It is objected that the bankrupt act is unconstitutional, in so far as it attempts to subject to its operation any persons other than "merchants and traders." That at the time of the adoption of the constitution the bankruptcy acts of Great Britain only embraced this class of persons, and that the grant in the constitution must be construed as limiting this power of congress to those persons only who were considered by the framers of the instrument capable of becoming or being adjudged "bankrupt." But this question is no longer open to discussion. Mr. J. Story says (Comm. § 1113): "In the English system the bankrupt laws are limited to persons who are traders or connected with matters of trade or commerce; but this is a mere matter of policy and by no means enters into the nature of such laws."

The only case in which the restricted view of the constitutional grant was adopted—In re Klein [Case No. 7,866],—was overruled by the circuit court, Mr. J. Catron presiding. In his opinion, that eminent judge observes: "But other and controlling considerations enter into the construction of the power. It is general and unlimited; it gives the unrestricted authority to congress over the entire subject, as the parliament of Great Britain had it, and as the sovereign states of this Union had it when the constitution was adopted. * * * In considering the question before me, I have not pretended to give a definition, but purposely

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 2 Cent. Law J. 79, contains only a partial report.]

avoided any attempt to define the mere word 'bankruptcy.' It is employed in the constitution in the plural, and as part of an expression—'the subject of bankruptcies.' The ideas attached to the word in this connection are numerous and complicated. They form a subject of extensive and complicated legislation; of this subject congress has general jurisdiction, and the true inquiry is, to what limits is that jurisdiction restricted? I hold it extends to all cases where the law causes to be distributed the property of the debtor among his creditors. This is its least limit. Its greatest is the discharge of the debtor from his contracts, and all intermediate legislation affecting substance and form, but tending to further the great end of the subject—distribution and discharge—is in the competency and discretion of congress. With the policy of a law letting in all classes, others as well as traders, and permitting the bankrupt to come in voluntarily and be discharged without the consent of his creditors, the courts have no concern." [Nelson v. Carland] 1 How. [42 U. S.] 278. The principles thus clearly enunciated have, so far as I am aware, been uniformly and universally followed by the courts, and they have recently been distinctly adopted and reaffirmed in cases which have arisen under the existing bankrupt act. In re Silverman [Case No. 12,-855], per Mr. J. Deady; In re Reiman [Id. 11,673], per Mr. J. Blatchford. The point must therefore be regarded as settled. The exception is overruled.

Second. It is objected that the act is unconstitutional so far as it applies to corporations, inasmuch as it denies to them the right to obtain a discharge in any case. It is contended that it is of the essence of a bankruptcy law to provide a discharge for all persons brought within its scope, unless that right has been forfeited by the misconduct of the bankrupt, that congress cannot make a law a "bankruptcy law" by merely designating it as such, nor, under color of passing such a law, assume the power to provide for the collection of debts and to regulate the relations of debtor and creditor throughout the United States; and that, inasmuch as this act prohibits the discharge of corporations in any case, it is not as to them a bankrupt law, and is, therefore, unconstitutional. The answer to this objection is, that it unwarrantably assumes the fundamental proposition on which it rests. I can nowhere find it decided or maintained that a law to be "a law on the subject of bankruptcy," within the meaning of the constitution, must provide for the discharge of all persons subject to its provisions.

The constitutionality of the act of 1841 was doubted, and even denied, so far as it sought to discharge a debtor and his future acquisitions from debts [created][2] before its pas-

sage, without the assent of a majority of his creditors; but I am not aware that it was contended that it must provide for his discharge, or else it would cease to be "a law on the subject of bankruptcy." By the bankruptcy law of 1841 [5 Stat. 443], every debtor could be discharged without payment in whole or in part, and without the assent of his creditors. With respect to this feature of the law, Chancellor Kent observes: "The provision in the bankrupt act which rendered it a general insolvent act, and was the one almost exclusively in operation, gave occasion to serious doubts whether it was within the true construction and purview of the constitution, and it was that branch of the statute that brought this system, and I think justly, into general discredit and condemnation, and led to the repeal of the law." 2 Kent, Comm. 391.

The constitutionality of the law was fully upheld (5 Hubb's N. G. R. [5 Hill] 317–327); but the question raised was, as we have seen, not whether a bankruptcy law must contain a provision for the discharge of the debtor, but whether it could, constitutionally, contain such a provision except in respect to merchants and traders adjudged to be bankrupts in an involuntary proceeding.

The bankrupt act [14 Stat. 533], even if all provisions for the granting of discharges were stricken out, would still retain the most important features of a bankruptcy law, viz.: Those which act upon the debtor in invitum. Those provisions are founded on what the author of the bill declared to be "the first principles of all such systems of laws," viz.: "That when insolvency beyond all reasonable chance of recovery occurs, the administration of the bankrupt's effects belongs to his creditors and not to himself." They are also intended for the protection of the creditor against the fraudulent practices and the reckless conduct of his debtors. They are designed to prevent preferences on the eve of failure—the secretion or abstraction of the property for the benefit of the debtor's friends or relatives, to provide that there shall be no transfers which cannot be inquired into, no settlements by an insolvent upon his wife or children which cannot be reached and declared void through the courts of bankruptcy.

To effect these objects the act provides that when a debtor (who need not necessarily be an insolvent) has committed any of the acts of bankruptcy defined in the act, he may be proceeded against in a summary manner. He may be deprived of the possession and control of all his property liable for his debts, and the title thereto vested in an assignee to be selected by his creditors, such title to relate back to the date of the commencement of the proceedings, and to include all property of the debtor, wherever situated in any state of the Union. Only national legislation could attribute such an operation to the assignment. It appears to me

[2] [From 11 N. B. R. 193.]

that these peculiar and characteristic provisions would be alone sufficient to impart to the law the quality of a "law on the subject of bankruptcy," and that it would remain such, though discharges should in all cases be withheld.

But, waiving this consideration and assuming for the sake of argument, that a law which failed to provide for the discharge of debtors, in any case, would not be "a law on the subject of bankruptcies," it does not follow that to be a law of that description it must provide for discharges in all cases where the right has not been forfeited by misconduct. Before the adoption of the recent amendments the bankrupt was denied his discharge except with the assent of a majority in number and value of his creditors, or in cases where his assets were sufficient to satisfy fifty per cent. of his debts. By the amended act of 1874 [18 Stat. 180], the assent of one third of his creditors or the payment of one third of his debts is sufficient. On a second application, a bankrupt who has already obtained a discharge must obtain the assent of three fourths in value of his creditors, or his assets must be sufficient to pay seventy per cent. of his debts.

If congress may constitutionally impose these conditions, and its right to do so has not been questioned, where are the limits to the exercise of its discretion? Why may it not require the payment of sixty, eighty or one hundred per cent. of the debts as a condition precedent to a discharge in any case? The withholding of the discharge in the cases I have mentioned cannot be said to be a punishment for a fault committed. For he who is unable to pay one half or one third of his debts may be as blameless as he who is able to pay sixty or eighty per cent. It cannot always be imputed to him as a fault that he has suffered a total instead of a partial financial shipwreck.

If, then, congress may, in its discretion, attach any conditions it sees fit to the right to obtain a discharge, it may attach impracticable ones, or ones that can rarely be complied with, or in particular cases it may refuse the right altogether; for a construction of the constitutional grant of power must be unsound which concedes to congress the right to refuse a discharge, in effect, while it denies the right to refuse it in terms.

It is unnecessary to advert to the reasons by which congress no doubt was governed in discriminating between corporations and natural persons, in respect to discharges. They are obvious, and seem abundantly sufficient to justify the provisions of the law. Nor need I dwell on the pernicious consequences, especially in this state, of a construction of the law which would exempt all corporations whatever from its operation. But, if the considerations I have suggested be not so conclusive as I think they are, they derive great support. if not from express decisions, yet from the tacit recognition of the validity of the law by all the courts of bankruptcy before which proceedings by or against corporations have been taken. The books contain about forty reports of such cases in the district and circuit courts, and in the supreme court of the United States. In no one has the objection I have been considering been noticed. I do not claim that this general acquiescence in the validity of the law has the authority of an express judgment on the point; but surely such a tacit admission and consent, semper ubique et ab omnibus, are entitled to great weight in determining a doubtful question of constitutional construction, even conceding this question to be such. I have considered this point at some length, because it was argued with great earnestness and zeal and with great apparent confidence in its soundness. The objection is overruled.

It is further objected that railroads are not comprehended within the words, "Moneyed business or commercial corporations" contained in the act. I do not deem it necessary to discuss this queston, as I consider it settled by authority. In the case of Winter v. Iowa, M. & N. P. R. Co. [Case No. 17,890], Mr. J. Dillon, Circuit Judge, observes: "The question whether railroad companies are within the operation of the act has several times been before the courts and, so far as the researches of counsel have extended, it has been uniformly decided that they are. Alabama & C. R. Co. v. Jones [Id. 126], per Woods, Circuit J.; Adams v. Boston, H. & E. R. Co. [Id. 47], per Shepley, J. Approved and doctrine reaffirmed by Clifford, J., in Sweatt v. Boston, H. & E. R. Co. [Id. 13,684]. Concurring in the views expressed in the opinions in these cases, it is not necessary to enter into an extended discussion of the question, or to repeat the arguments by which the conclusion reached is sustained." This decision is followed in several subsequent cases which it is not necessary to cite.

The only adverse authority is a notice of an oral decision rendered by Mr. J. Durell, late district judge for the district of Louisiana. The grounds on which this decision is based are not stated. I do not consider that a single case decided by a district judge is sufficient to countervail the authority of so many cases decided by circuit judges, and in one instance by a justice of the supreme court. I shall therefore dismiss the point with one further observation.

It was urged that railroad companies are the most important corporations in the United States. That from various causes the earnest attention of the country has been drawn to a consideration of their rights, duties, liabilities, and their relation to the state and national government. It is therefore argued that if congress had intended to include them within the provisions of the act, they would have been mentioned by their popular and characteristic name. But I think the fact stated justifies precise-

ly the opposite inference. That the question, whether railroads should or should not be subjected to the provisions of the act, was not overlooked by congress, must be conceded. That the framers of the act had a certain and definite intention with regard to them, is clear. If, then, it had been intended to withdraw them from the operation of the act, they would have been excepted by name. It is inconceivable that congress, with its attention drawn to the subject, and alive to its importance, should, if it had intended to exempt them, have used words which, in their natural and popular, as well as their legal sense, as interpreted by the courts, necessarily include them. The exception is overruled.

It is further objected that the debts due the petitioning creditors being secured debts, are not "provable" within the meaning of the thirty-ninth section of the act. This objection is founded on the language of the twentieth section. [14 Stat. 526.] That section provides in substance that a creditor whose debt is secured by mortgage or other lien, on the bankrupt's property, "shall be admitted as a creditor only for the balance of the debt after deducting the value of such property to be ascertained by agreement between him and the assignee, or by a sale thereof, to be made in such manner as the court may direct; or the creditor may release and convey his claim to the assignee upon such property, and be admitted to prove his whole debt. * * * If the property be not so sold, or released and delivered up, the creditor shall not be allowed to prove any part of his debt."

It is urged that by this section the secured creditor is not allowed to prove his debt until the value of the security is ascertained, in the manner prescribed by the act, unless he surrenders his security—and that this value can only be ascertained after adjudication and the appointment of an assignee; until then he has no "provable debt." But, to ascertain the true meaning of this section, other provisions must be resorted to. Section 22 provides that every creditor desiring to be admitted to share in the estate of the bankrupt, by virtue of a debt owing to him from the bankrupt, must exhibit his demand in a deposition setting forth the consideration thereof, "and whether any and what securities are held therefor." In form 21, the mode in which "proof of debt with security" shall be made, is specially prescribed by the supreme court. By this form the creditor is required to set forth "a particular description of the debt, and also of the property held as security, and the estimated value of such property." It is apparent from these provisions that the secured creditor not only may, but must prove his debt before he can be recognized as a creditor, with or without security.

Upon the proof so made a hearing may be had, testimony taken and an adjudication made. That adjudication, if in favor of the creditor, will establish the fact and amount of the bankrupt's indebtedness to him, and the further fact that he has a valid lien on the property claimed as security. The value of that security is to be ascertained subsequently, as provided in section 20. It has accordingly been held, where a secured creditor applied to the court for an order for the sale of the security held by him, that such order would be withheld until he had proved his debt under the twenty-second section and established the existence of the debt and that the property claimed as security was in fact pledged to him. In re Bigelow [Case No. 1,396]. Construing, then, the twentieth and twenty-second sections together, the meaning of the former becomes clear and unmistakable.

"As used in that section, the word 'debt' means the amount upon which the dividend is to be computed, and the phrase 'prove his debt' is equivalent to the phrase 'share in the distribution of assets.'" Per Mr. J. Benedict, Id. This construction of the twentieth and twenty-second sections of the act given by Mr. J. Benedict, in the case above cited, and which is the leading case on the subject, has been adopted by the courts with almost entire unanimity. In re Stansell [Case No. 13,293], Emmons, Circuit Judge, says: "I concur fully in the interpretation which reads section 22 and forms 21 and 25, as requiring all creditors, secured and unsecured, alike to prove their claims, and which construes the last clause of section 20, prohibiting the proof of any part of the secured claim to mean only that the creditor shall not be admitted to share in the assets except for the just balance beyond his security." And for this the learned judge cites a very large number of authorities, and quotes with approval the language of Dillon, Circuit Judge, to the effect that "the debt of a mortgagee is provable and such proof does not waive his lien."

The only adverse decision which has been referred to, is that of Mr. J. Blodgett. In re Frost [Case No. 5,134]. In that case, the learned judge holds that by "debts provable" under the act, congress meant debts unconditionally provable. For this position he cites no authority; nor does he refer to any one of the numerous cases I have mentioned above. He seems to have been led to the conclusion he adopts by the desire to frustrate any collusion between the debtor and a sufficient number of his secured creditors, to prevent the unsecured creditors from obtaining the requisite number and values to enable them to file a petition.

But any debtor who can secure the co-operation of more than three-fourths in number, or two-thirds in value, of his creditors, may put it out of the power of the remainder to procure his adjudication. By the provisions of the act they have an absolute veto on the proceeding. The exclusion of the se-

cured creditors from the computation, may, in some cases, mitigate the evil, if it be one; but it will be merely a palliative and not a preventive. Nor will the practical operations of the rule laid down by the learned judge be found entirely satisfactory.

The enormous proportions which the indebtedness of railroad corporations has assumed in this country is well known. It exists almost universally in the form of bonds secured by mortgages on the roads. Where, as must often be the case, the indebtedness so secured exceeds the value of the road, the mortgagees are virtually its owners. It may be for their interest, and they may unanimously desire to allow the companies to continue in the possession of the road, and to look to an increase of population and the development of the country for their ultimate reimbursement. But if secured debts are not "provable" debts, and the bondholders are excluded from either side of the computation, it will be in the power of one-fourth in number and one-third in value of the creditors to whom the floating debts of the company are due, to put it into bankruptcy, and this when the total floating debt may be insignificant in amount compared with the debts due to the bondholders. It appears to me that in deciding so vital a question, the bondholders should have a voice proportioned to their interests. But whatever be the force of this suggestion, I think it clear from the language of the twenty-second section and forms 21 and 25, and from the overwhelming weight of authority, that a secured creditor must be deemed to have a "provable" debt within the meaning of the thirty-ninth section of the act.

The question then arises: To what amount is the secured debt to be deemed provable? In replying to this question, one of two alternatives must be adopted. The debt must either be reckoned at its full amount, irrespective of the value of the security, or else at that amount less the value of the security. But it is apparent that it would be as unjust and as absurd to allow a creditor, who is fully secured, and who may be considered as virtually paid, inasmuch as he holds in hands the means of payment, to control a proceeding which has for its object the prevention of frauds by the bankrupt in respect of his other property, and its equal distribution amongst his other creditors, as it would be in the contrary case to deny to the creditor, whose security is little more than nominal, and who looks to the general assets for the payment of the greater part of his debt, any voice in the matter. Reason and justice seem to require that the rights of each should be proportionate to his interests involved, and that the amount at which the debt of every secured creditor is to be reckoned should be ascertained by first deducting the value of the security.

But it is objected that this mode of ascertaining the amount of the debts is impracticable, for no power is given to the court to determine the value of the security for such a purpose and at this stage of the proceeding. I admit that for the purpose of ascertaining for what amount the secured creditor shall share in the distribution of general assets, or in the language of section 27, for what amount his debt shall be considered "proved and allowed," the provisions of the twentieth section must be resorted to. But it does not follow that for the purpose of ascertaining whether creditors to the requisite amount have joined in the petition, the court may not provisionally make the necessary inquiry. That the court was not deemed by congress incompetent to make it is shown by the provisions of the forty-third section, in relation to "composition with creditors." That section provides that "the value of the debts of secured creditors above the amount of such security to be determined by the court shall, as nearly as the circumstances shall admit, be estimated in the same way."

The powers conferred upon the district courts by the bankruptcy act are of the most comprehensive character. Section 1 provides that "the several district courts of the United States be, and they hereby are, constituted courts of bankruptcy, and they shall have original jurisdiction, in their respective districts, in all matters and proceedings in bankruptcy, and they are hereby authorized to hear and adjudicate upon the same according to the provisions of this act. * * * And the jurisdiction hereby conferred shall extend to all cases and controversies arising between the bankrupt and any creditor or creditors who shall claim any debt or demand under the bankruptcy—of the assets of the bankrupt—to the ascertainment and liquidation of the liens and other claims thereon, specific to the adjustment of the various priorities and conflicting interests of all parties, and to the marshaling and disposition of the different funds and assets, so as to secure the rights of all parties, and the due distribution of the assets among all the creditors, and to all acts, matters and things to be done, under and in virtue of the bankruptcy, until the final distribution and settlement of the estate of the bankrupt, and the close of the proceedings in bankruptcy." By the second section, jurisdiction, concurrently with the circuit courts is given, "of all suits at law or in equity, which may or shall be brought by the assignee in bankruptcy against any person claiming an adverse interest, or owing any debt to such bankrupt, or by such person against such assignee touching any property or rights of property of said bankrupt transferable to or vested in such assignee."

The jurisdiction thus attributed to the district courts is more varied and extensive than that conferred by all other acts of congress combined. It was evidently the intention of congress to establish a complete system of bankruptcy proceedings, and to con-

fer upon the "courts of bankruptcy" constituted by the act, plenary jurisdiction over the whole subject and extending to "all matters, acts, and things to be done under and in virtue of the bankruptcy." In the exercise of this jurisdiction these courts have the authority to do every act necessary and proper to carry into effect the policy and purposes of the law. The strict rules of construction which are applied in cases where a special statute gives to a court power to do a particular thing. such as to open streets, to condemn property, to determine contested elections and the like, and which prescribes the precise mode in which the power shall be executed, have no application to a case like the present, where full and complete jurisdiction over an extensive subject is given to a court constituted for the purpose.

On this point we are not without authorities to guide us. The district courts have, in numerous instances, issued injunctions against secured creditors seeking to enforce their security by foreclosure in the state courts, or by a sale under a power contained in the mortgage, or by a trustee appointed in a trust deed. See Markson v. Heany [Case No. 9,098], and cases cited; Phelps v. Sellick [Id. 11,079]. And yet no power to issue injunctions in this class of cases is expressly conferred by the act. In the case of In re Alexander [Id. 161], the point under consideration was expressly decided. The question was made whether the debt due a secured petitioning creditor amounted to $250 in value. It was objected that, until an assignee was appointed, the value of the security could not be legally ascertained. But the court (per Mr. J. Lowell) held that this was too strict and literal a construction of the statute, and that it might inquire into the value of the security in order to ascertain what was the amount of indebtedness practically unsecured. "This," the court observes, "will be a question of fact like any other, and no more difficult to decide than such as often arise." So where it was claimed that the alleged bankrupt had counterclaims against the petitioning creditor which would reduce the amount of the debt due below $250. the court proceeded to inquire into the validity and amount of the counterclaims, notwithstanding that such an inquiry involved an assessment of unliquidated damages. In re Osage V. & S. K. R. Co. [Id. 10,592].

For these reasons. and on these authorities, I conclude that the court has authority to inquire into and determine what is the value of the securities held by the creditors of the alleged bankrupt, in order to ascertain whether the claims of the petitioning creditors are of the amount required by the statute.

It is further objected that this court has no jurisdiction over the respondents and can acquire none, inasmuch as the bankrupt act provides no mode of serving the petition and order to show cause, upon a corporation. This objection admits the intention of congress to confer jurisdiction over corporations, but it claims that that jurisdiction must fail, by reason of the accidental omission to provide for its exercise. The objection proceeds upon the assumption that the courts of bankruptcy constituted by the act are special courts of limited and strictly defined powers, and that they can exercise no authority derived from other acts of congress, and not in terms conferred by the bankruptcy act. The validity of that assumption I have already discussed. The views heretofore suggested apply with equal force to this question now under consideration.

It may be stated in addition that the act declares that the word "person" shall include "corporations," and I see no insuperable difficulty in construing the act to mean, when directing service to be made on the debtor "personally," or "by leaving the order at his last or usual place of abode," that service is deemed to be made "personally," on a corporation, when it is effected in the only mode in which a service can be made on such artificial persons, viz.: by delivering it to its head or principal officers, who are its visible representatives; nor do I consider it wholly inadmissible to construe the words "usual place of abode" to mean, in regard to corporations (ut lex magis valeat quam pereat), their principal place of business, where alone they can be said to abide. But if these interpretations be rejected as strained and farfetched, then I am clearly of the opinion that the court is at liberty to resort to other acts of congress, the "judiciary," the "process" act, and the late "act for the better administration of justice," for authority to employ the means necessary to the exercise of the jurisdiction so clearly conferred upon it.

The inference to be drawn from the omission by congress to prescribe in the bankrupt act the mode in which corporations should be served, is not that it was an accidental blunder by which the operation of the act with respect to compulsory proceedings against corporations was defeated, but rather that it indicates that congress intended that where the bankrupt act was silent, the general laws providing for the practice and proceedings in the courts of the United States should apply. If the objection urged in the present case be valid, I see not why the same objection might not be urged in the circuit or district courts in all suits by an assignee against a corporation indebted to the bankrupt. The purpose of the act would thus in a great measure be defeated.

I find in no reported case a hint or intimation that the bankrupt act is to be construed to be a practice act in bankruptcy cases, and that only proceedings therein expressly authorized can be adopted. But there are several cases which can only be supported on a contrary supposition. In Re Mendenhall [Case No. 9,423] it was held that the district

court will order the production of books and papers at the summary hearing on the return day of the order to show cause, and that the fifteenth section of the judiciary act is applicable to such cases; and if not, the general scope of the bankrupt act gives plenary power. In Re De Forrest [Id. 3,745] it was held that where the debtor denied the alleged acts of bankruptcy and demanded trial by jury, the court had the same power over verdicts rendered in such cases as courts of common law, and may, on proper cause shown, set them aside and order a new trial. And in Knickerbocker Ins. Co. v. Comstock [Id. 7,879] it was decided by the supreme court that the rulings of the district court in trials of this description may be reviewed by the district court on writ of error, and that the writ must be sued out according to the provisions of the judiciary act, except that it must be applied for within ten days.

It was further held in that case that the proceeding by a creditor against an alleged bankrupt is essentially a suit at common law, and must be governed by the rules applicable to such suits. 16 Wall. [83 U. S.] 258. If, then, this proceeding be in the nature of a suit at common law, it falls within the language and meaning of the thirty-second general order in bankruptcy, adopted by the supreme court by the authority of the act. That order provides that in "the proceedings at law instituted for the purpose of carrying into effect the provisions of the act, or for enforcing the rights and remedies given by it, the rules of the circuit court regulating the practice and procedure in cases at law shall be followed as nearly as may be." It is not denied that the service made on the respondent in this case would have been valid and effectual if made in a suit at common law in the circuit court. If to those considerations we add the fact that jurisdiction over corporations has been exercised since the passage of the act in almost every district of the United States, without hesitation or question as to the power of the court to serve them with process, no doubt will, I think, remain as to the disposition which should be made of the objection. The exception is overruled.

It is further objected, that the authority under which the agent of the petitioning creditor acts is not set forth in the petition. I have found no provision of law, authority or precedent which requires this to be done. It is also objected that the petition is not signed by the creditors personally.

With respect to the signing and verification of the petition, the act provides that "the petition of creditors, under this section, may be sufficiently verified by the oaths of the first five signers thereof, if so many there be, and if any of said first five signers shall not reside in the district in which such petition is to be filed, the same may be signed and verified by the oath or oaths of the attorney or attorneys, agent or agents of such signers."

The effect of these provisions is two-fold: First, to dispense with a verification by any greater number than the first five signers; second, to allow both the signing and the verification to be done by an agent, when the first five signers, or any of them, are absent. But if the personal signatures of all the other petitioning creditors are required, this provision, evidently intended for the benefit of absent creditors, would be, to a great extent, defeated. And why should they be compelled to sign personally, when the first five, who alone are required to verify, may both sign and verify by attorney? I think it plain that the act intended to allow all the creditors who might be absent from the district to sign by attorney. Under the practice said to prevail generally in the bankruptcy courts, the verification may be defective in not alleging authority from the creditors to sign and verify the petition. The verification merely avers that F. F. Low is "the duly authorized agent and attorney of the petitioners." But this defect, if it be one, may be amended. In re Simmons [Case No. 12,864].

And, finally, it is objected that the petition for adjudication, and the petition for an injunction presented and filed simultaneously therewith, show that the debts due the petitioning creditors do not amount to one-third of all the debts of the respondent provable under the act. The petition avers that the aggregate amount of debts held by the petitioning creditors is $1,500,000, for which they hold security to the value of twenty per cent. Deducting twenty per cent. from the amount of the debt, we have $1,200,000 as the amount to be reckoned for the purpose of this inquiry.

The petition also avers that the respondent is indebted in the sum of $3,500,000, of which the $1,500,000 due to the petitioning creditors forms a part. Deducting twenty per cent. from this amount we have $2,800,000 aggregate debt provable under the act. It is also averred that the respondent is indebted in the sum of $1,600,000 on certain bonds issued by it. If this sum be added to the $2,800,000 already ascertained, we have $4,400,000, of which the $1,200,000 held by petitioners is not one-third. It is claimed that the sum of $1,600,000 must be left out of the computation, inasmuch as the petition avers that it is secured, which must be taken to mean fully secured. I very much doubt whether such a construction of the language is admissible. I waive the point, as the defective averment may be cured, if the facts warrant it, by amendment. At the time of filing and presenting to the court the petition for adjudication, there was also filed and presented a petition for an injunction to restrain the respondent from carrying into effect an arrangement for substituting mortgage bonds for certain income bonds so-called, heretofore issued by it, to the amount of $1,000,000, up-

on which interest to the amount of $50,000 is now due. These bonds this petition avers to be wholly unsecured. Adding this $1,-050,000 to $2,800,000 before obtained, we have $3.850,000, of which the petitioners' debt is not one-third.

But it is urged that the averment in the petition that the debts due the petitioners amount to at least one-third of all the debts provable against the respondent, is positive and explicit, and that the court cannot look to the petition for an injunction to ascertain the true state of facts. But in this view I cannot acquiesce. The petition for injunction was presented to the court, and an order obtained thereon at the same time with the petition for adjudication. It is signed and sworn to by the same agent of the creditors who signed and verified the latter. It is not suggested that its allegations are untrue. The prayer being for an injunction against the alleged bankrupt, the contents of this petition might have been embodied in the petition for adjudication. Irving v. Hughes [Case No. 7,076]. I do not think that the circumstance that the allegations are contained in a separate paper would justify the court in closing its eyes to the facts set forth in it.

It is evident from the terms of the thirty-ninth section, that congress was solicitous to restrict the rights of creditors to put a debtor into bankruptcy, rigorously to those cases where the requisite proportion in number and value united in the petition. Even where the debtor admits in writing that the requisite amount and number have petitioned, the court must still "be satisfied that the admission is made in good faith." How can the court be satisfied that the requisite amount and number have petitioned, when by the sworn statement of their agent and attorney it appears that they have not? In cases where the allegation as to the amount and number of the petitioning creditors is denied by the debtor, the court is required by the act to order him forthwith to file a full list of his creditors, with their places of residence and the sums due them respectively. But surely the debtor ought not to be compelled to make such an exposure of the state of his affairs when it appears from the sworn statements of the petitioning creditors on file in the cause that the requisite amount and number have not petitioned. The exception is sustained, but the creditors are entitled to ten days' further time, within which other creditors may join.

This opinion has extended to a far greater length than I had purposed, or than was perhaps to be desired. The case might have been disposed of on the last point alone. But the other questions considered were elaborately argued by eminent counsel, and they are liable to arise in other cases. The occasion seemed, therefore, a fit one to consider and set them at rest so far as the decision of this court can have that effect.