## CAMPBELL v. ALLEGHANY CORPORATION (two cases).

### Nos. 3831, 3845.

Circuit Court of Appeals, Fourth Circuit.

March 2, 1935.

Richard W. Hagan, Jr., of New York City, for appellant.

George Weems Williams, of Baltimore, Md. (Marbury, Gosnell & Williams, of Baltimore, Md., Tolles, Hogsett & Ginn and Thomas H. Jones, all of Cleveland, Ohio, and Wm. H. Chamberlain, on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and McCLINTIC, District Judge.

PARKER, Circuit Judge.

This is an appeal from an order confirming a plan of reorganization of a debtor corporation under section 77B of the Bankruptcy Act (Act of June 7, 1934, c. 424, 48 Stat. 912, 11 USCA § 207). On November 28, 1934, the corporation, which for some time had been unable to pay its debts as they matured, filed its petition for relief under section 77B in the court below, and on the same day the petition was approved by the District Judge. On December 1st it submitted its plan of reorganization affecting the rights of certain bondholders, and on December 7th, pursuant to order of court, gave notice to all stockholders, bondholders, and other creditors that it was asking the court to approve the plan, sending copy of the plan with the notice. The holders of 77 per cent. of the bonds affected by the plan accepted it in writing, although the acceptance of most of these was before the petition was filed and that of a considerable number before

the passage of the act of June 7th. On December 29th, after full hearing, the court approved and confirmed the plan, finding that it was fair and equitable, that it did not discriminate unfairly in favor of any class of creditors or stockholders, that it was feasible, and that it had been accepted in accordance with subdivision (e), § 77B, of the act (11 USCA § 207 (e).

This appeal is brought by one Thomas Campbell, the owner of bonds of the par value of $26,000 of the issue of $24,532,000 affected by the plan of reorganization. He objected to the plan in the court below on various grounds; but on this appeal he raises no question as to the findings of the court with respect thereto, except as to the sufficiency of the written acceptances by the bondholders of the plan of reorganization. He contends: (1) That the corporation has not secured the consent to the plan of two-thirds of the bondholders affected, in that the written acceptances filed with the court were given, as he contends, to a plan of corporate refinancing as distinguished from a plan of reorganization under section 77B; and (2) that section 77B violates the provisions and guaranties of the Constitution of the United States.

On the first question, it appears that, on March 15, 1934, the corporation sent out to the holders of its twenty-year collateral trust convertible 5 per cent. bonds, due April 1, 1950, which are the bonds affected by the plan of reorganization, a letter proposing a plan for refinancing the interest thereon during the ensuing five year period. Without going into the details of this plan, it is sufficient to say that it provided for the issuance of certain "prior preferred convertible stock" of the corporation in lieu of the interest coupons which would mature during the period, and gave to the holders of bonds the option to convert them into common stock of the corporation if they so desired. Accompanying the letter which proposed this plan of refinancing was a "letter of transmittal" to be signed by the holders of bonds, in accepting the plan, and to accompany a deposit of bonds with the company for the purpose of carrying it out. This letter of transmittal authorized and directed the corporation "to do or cause to be done all things necessary or appropriate fully to carry out said plan." It also authorized and directed the corporation "to hold said bonds and to deal therewith as set forth in said Plan" and "fully to carry out the provisions of said Plan and

to do or cause to be done all things necessary or appropriate in so doing."

By November 28, 1934, $17,821,000 of the total of $24,532,000 of the bonds, or 72 per cent. thereof, had been deposited with the corporation accompanied by letters of transmittal accepting the plan proposed and authorizing the corporation to do all things necessary or appropriate to carry out its provisions. Of this $17,821,-000, the sum of $4,528,000 had been deposited prior to June 7, 1934, the effective date of the Corporate Reorganization Act, and the remainder subsequent to that date. On November 28th, the directors of the corporation adopted a resolution declaring that, in view of the passage of the Corporate Reorganization Act, it was their judgment that sufficient bonds had been deposited under the plan, that the plan be declared operative subject to any ratifications that might be required under applicable federal legislation and to final confirmation by the United States District Court, and that the corporation forthwith file in that court a petition for reorganization pursuant to the plan. On the same day, a petition under section 77B was filed in the court below; and on December 1st a proposed plan of reorganization was filed with the court which was in all respects the plan proposed in the letter of March 15, 1934.

The court fixed December 28, 1934, as the date for the hearing to consider the plan of reorganization and ordered notice given to bondholders, creditors, and stockholders of the corporation. This notice was given; and a letter to bondholders from the corporation advised them that it had filed petition for the purpose of having the readjustment plan proposed in the letter of March 15th approved by the court as the plan of reorganization under federal law relating to corporate reorganizations. None of the bondholders who had deposited bonds or filed written acceptance of the plan attempted to reclaim the bonds or withdraw the acceptance given; but, on the contrary, additional bonds were deposited and additional acceptances were filed by bondholders, so that at the time of the hearing the total amount of the bonds deposited was $18,992,000, or in excess of 77 per cent. of the bonds affected by the plan.

There can be no question, we think, but that this was a sufficient acceptance of the plan of reorganization to meet the requirements of subdivision (e) of section 77B.

Not only does it appear that the identical plan submitted to the court was accepted in writing by creditors holding more than two-thirds in amount of the bonds to be affected by the reorganization, but it also appears that in accepting it they authorized the corporation to do all things necessary or appropriate to carry it out. One of the things appropriate to accomplish this purpose was the filing of a petition for reorganization under section 77B; and the fact that this statute had not been passed at the time that some of the acceptances were given does not render action under it any the less appropriate. Furthermore, the fact that the bondholders who had accepted the plan in writing prior to the passage of the act did not attempt to withdraw their acceptance, when advised of the filing of the petition by the corporation and of its intention to use the acceptance in proceedings under the act, shows that they not only accepted the plan but also acquiesced in their acceptance being used for the purposes of a reorganization under the statute.

It is argued that the refinancing plan submitted in the letter of March 15th is different from the plan of reorganization sought under the statute in that the former is voluntary and does not bind nonassenting bondholders, whereas the latter can be enforced against such nonassenting bondholders if accepted by the necessary two-thirds and approved and confirmed by the court. This, however, is not a difference in the plan but in the means of securing its adoption; and the very purpose of the statute was to provide means by which plans of reorganization approved by the court as fair and equitable might not be blocked by the opposition of nonassenting minorities. The statute provides that the acceptance of the plan by the necessary two-thirds of the creditors affected may be obtained either before or after the filing of the petition; and we see no reason to read into it either a requirement that the plan itself specify enforcement by the court or that the acceptance be obtained after the passage of the statute. The statute is of a remedial character, designed to facilitate the reorganization of corporate business made necessary by the economic depression through which the country has been passing. Its purpose should be forwarded by a fair and liberal construction of its provisions, not thwarted by any narrow or technical interpretation, and certainly not by reading into its language conditions and limitations

which the lawmakers themselves did not see fit to express.

■ And we entertain no doubt as to the constitutionality of the statute. It is an exercise of the power conferred on Congress by article 1, § 8, cl. 4 of the Constitution, "to establish * * * uniform Laws on the subject of Bankruptcies throughout the United States," adapted to the conditions presented by modern industrial organization. Prior to the passage of the act, neither proceedings under the old bankruptcy laws nor receiverships in equity furnished adequate relief for distressed corporate debtors, their creditors and stockholders, under modern conditions. Great corporate enterprises had grown up, with branches in many states, with a huge volume of bonded debts having different priorities with respect to different properties, and with many classes of stock having different voting privileges and property rights. Proceedings under the old bankruptcy laws were inadequate because no machinery existed to scale down secured debts without a sale of the security; and a sale almost necessarily resulted in a sacrifice of the property at an inadequate price because of the lack of persons in a position to bid for it. If forced to sale, it was frequently, if not generally, bought in by a committee of bondholders at the inadequate prices which forced sales notoriously yield, with the result that nonassenting bondholders received little and stockholders nothing at all. Equity receiverships and foreclosures were inadequate for the same reason; and they were unsatisfactory for the additional reason that ancillary receiverships with their burden of fees and costs were necessary if the property to be administered lay in more than one jurisdiction. State laws were inadequate to meet the situation, which had become acute as a result of the widespread increase of corporate debts during the period of expansion and the shrinkage of property values which followed in the economic depression. Only by the further exercise of the bankruptcy power of Congress could adequate relief be afforded these distressed corporate debtors and their creditors; and the act in question was passed for the purpose of affording this relief. Its provisions are thus well summarized in a recent article:* "Section 77B of the Bankruptcy Act sets up in the federal courts a system for the statutory reorganization of distressed corporations. The procedure which it prescribes makes use of devices which are novel to federal legislation. It applies only to corporate debtors; it permits the bankruptcy court to take jurisdiction over corporations which are not insolvent in the present bankruptcy sense and it authorizes the adjustment of the rights of the stockholders of such corporations; it seeks to control secured as well as unsecured debts; it provides for the circumstances under which creditors may be compelled to accept securities instead of cash in settlement of their claims; it imposes limitations on the allowance of rent claims; it empowers the judge to scrutinize and disregard the provisions of deposit agreements and of trust indentures; it places restrictions upon the labor policies of corporations undergoing reorganization."

To this should be added that, while the corporation need not be insolvent in the sense that its liabilities exceed its assets to take advantage of the act, it must show in its petition that it is "insolvent or unable to meet its debts as they mature." Bankr. Act § 77B (a), 11 USCA § 207 (a). And upon the filing of a petition by a debtor in a proceeding under the act, or upon the filing by him of an answer claiming the benefit of the act in an involuntary bankruptcy proceeding, the court is vested with the same jurisdiction and power over the debtor and its property, and over the rights and liabilities of its creditors, as if a petition for adjudication of bankruptcy had been filed and a decree of adjudication had been entered. Bankr. Act § 77B (o) 11 USCA § 207 (o).

■ It is, of course, no ground of constitutional objection that the act relates only to corporate debtors; for it is well settled that the uniformity prescribed by the Constitution is "geographical and not personal" and that bankruptcy legislation need not apply to all classes of persons in the same way. Hanover Nat. Bank v. Moyses, 186 U. S. 181, 188, 22 S. Ct. 857, 46 L. Ed. 1113; Stellwagen v. Clum, 245 U. S. 605, 613, 38 S. Ct. 215, 62 L. Ed. 507; Leidigh Carriage Co. v. Stengel (C. C. A. 6th) 95 F. 637; In re California Pac. Ry. Co., 3 Sawy. 240, Fed. Cas. No. 2,315. The inquiries as to the constitutionality of the act which are pertinent here are: (1) Whether a law authorizing a court to readjust the debts and

---

* "Constitutionality of Section 77B of the Bankruptcy Act," by Professor John Gerdes, New York University Law Quarterly Review, vol. XII, p. 196.

obligations of an embarrassed corporate debtor, unable to pay its debts as they mature, without making a formal adjudication of bankruptcy or taking possession of its property for distribution among creditors, can be sustained under the power over bankruptcies vested in Congress; and (2) whether a law authorizing a court to scale the debts of such debtor and require creditors to accept something other than money in lieu of their claims can be sustained when tested by the due process clause of the Fifth Amendment. We think that both of these questions must be answered in the affirmative.

■ The grant of power to Congress to establish uniform laws on the subject of bankruptcies is not limited to the forms in which that power has heretofore been exercised by Congress or by the laws relating to bankruptcy which had been enacted in England or in the several American Colonies prior to the adoption of the Constitution. See article by Prof. Gerdes in XII New York University Law Quarterly Review, 198, and article by Jacob J. Kaplan, vol. XXI American Bar Association Journal, p. 47, for a history of these acts. All phases of the relationship between a debtor financially embarrassed and his creditors are brought under the control of Congress by the constitutional grant of power; and the fact that a particular mode has hitherto been employed in dealing with this relationship is not to be taken as a measure of the power over it. Hanover Nat. Bank v. Moyses, 186 U. S. 181, 22 S. Ct. 857, 46 L. Ed. 1113; Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529; In re Landquist (C. C. A. 7th) 70 F.(2d) 929, 931; In re Klein, Fed. Cas. No. 7,865, reported as note to Nelson v. Carland, 1 How. 265, 277, 11 L. Ed. 126, 130; In re Reiman, 7 Ben. 455, Fed. Cas. No. 11,673; Kunzler v. Kohaus, 5 Hill (N. Y.) 317. As said in Story on the Constitution, § 1113, quoted in In re Reiman, supra: "Perhaps, as satisfactory a description of a bankrupt law as can be framed is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of persons failing to pay their debts." And as pointed out by the Circuit Court of Appeals of the Seventh Circuit in Re Landquist, supra, inability to pay (except under the act of 1867, 14 Stat. 517) has always been recognized in this country as entitling a debtor to the benefit of the bankruptcy acts "whether that inability were caused by a lack of assets or a lack of liquidity of assets." Certainly, the act here in question is for the relief of corporate debtors who are unable to pay and their creditors, and falls well within the purpose of the constitutional grant of power.

In Canada Southern Ry. Co. v. Gebhard, 109 U. S. 527, 3 S. Ct. 363, 368, 27 L. Ed. 1020, the Supreme Court dealt with a railway reorganization, perfected under a Canadian statute which made the plan of reorganization binding upon bondholders and stockholders. Speaking of the English Railway Companies Act of 1867 and the Canadian Act and their application to outstanding securities, the court said:

"The nature of securities of this class is such that the right of legislative supervision for the good of all, unless restrained by some constitutional prohibition, seems almost necessarily to form one of their ingredients, and when insolvency is threatened, and the interests of the public as well as creditors are imperiled by the financial embarrassments of the corporation, a reasonable 'scheme of arrangement' may, in our opinion, as well be legalized as an ordinary 'composition in bankruptcy.' In fact such 'arrangement acts' are a species of bankrupt acts. Their object is to enable corporations created for the good of the public to relieve themselves from financial embarrassments by appropriating their property to the settlement and adjustment of their affairs, so that they may accomplish the purposes for which they were incorporated. * * *

"The confirmation and legalization of 'a scheme of arrangement' under such circumstances is no more than is done in bankruptcy when a 'composition' agreement with the bankrupt debtor, if assented to by the required majority of creditors, is made binding on the non-assenting minority. In no just sense do such governmental regulations deprive a person of his property without due process of law. They simply require each individual to so conduct himself for the general good as not unnecessarily to injure another. Bankrupt laws have been in force in England for more than three centuries, and they had their origin in the Roman law. The constitution expressly empowers the congress of the United States to establish such laws. Every member of a political community must necessarily part

with some of the rights which, as an individual, not affected by his relation to others, he might have retained. Such concessions make up the consideration he gives for the obligation of the body politic to protect him in life, liberty, and property. Bankrupt laws, whatever may be the form they assume, are of that character."

As pointed out by the Supreme Court in the passage just quoted, a corporate reorganization, such as is provided for by the statute here, involves nothing more than is done in an ordinary bankruptcy proceeding when a composition agreement is made binding upon the nonassenting minority of creditors; and there can be no question as to the constitutionality of such composition provisions of the bankruptcy statute. See Myers v. Int. Trust Co., 273 U. S. 380, 47 S. Ct. 372, 71 L. Ed. 692; Nassau Works v. Brightwood Co., 265 U. S. 269, 44 S. Ct. 506, 68 L. Ed. 1013; Cumberland Glass Co. v. De Witt, 237 U. S. 447, 35 S. Ct. 636, 59 L. Ed. 1042; Wilmot v. Mudge, 103 U. S. 217, 26·L. Ed. 536; In re Lane (D. C.) 125 F. 772, 773; In re Reiman, supra; General Orders in Bankruptcy, 12, 32, and 41 (11 USCA § 53). After a petition or answer is filed under section 77B, if a plan of reorganization is not proposed or accepted, or, if proposed and accepted, is not confirmed, the court, if it retains jurisdiction of the matter, proceeds to liquidate the estate of the debtor as in an ordinary proceeding in bankruptcy (Bankr. Act § 77B (c) (8), 11 USCA § 207 (c) (8); and in such case, of course, the questions raised as to the constitutionality of the proceeding could have no application. If the plan is accepted and confirmed by the court, nonassenting creditors have no more reason to complain than nonassenting creditors in a composition in an ordinary bankruptcy proceeding, and the power of Congress to provide that these shall be bound by the composition proceedings cannot be better expressed than it was by Mr. Justice Blatchford, then District Judge, in Re Reiman, supra, where he said: "What is 'the subject of bankruptcies'? It is not, properly, anything less than the subject of the relations between an insolvent or non-paying or fraudulent debtor, and his creditors, extending to his and their relief. It comprises the satisfaction of the debt, for a sum less than its amount, with the relief of the debtor from liability for the unpaid balance, and the right of the creditor to require that the amount paid in satisfaction shall be substantially as great a pro rata share of the property possessed by the debtor as it can pay, or can reasonably be expected to pay. * * * In view of all these considerations, how can it be said that these provisions for composition do not relate to the 'subject of bankruptcies'? They relate to the subject of debts owing by a debtor to creditors, and to the relation of the debtor to his creditors, in view of his assets and of such debts. They place the subject under the jurisdiction of the court of bankruptcy, and require a petition in bankruptcy to be pending, either voluntary, which requires prior insolvency to be alleged, or involuntary, which requires the commission of a prior act of bankruptcy to be alleged; and, in either case, proceedings for composition are necessarily predicated on insolvency or existing inability to pay the debts in full. But, even if a more restricted meaning be given to the expression 'subject of bankruptcies,' there is, within the scope of the discretionary power possessed by congress, of choosing the means to accomplish the end, a substantial appropriation of the existing property of the debtor towards all the debts due by him. There is not, as there is in proceedings carried through in bankruptcy, a pro rata payment on the debts only of those creditors who prove their debts, but all creditors are to have a payment pro rata. It must, therefore, be held, that the statutory provisions for composition are not open to the objection, that they are not warranted by the constitution."

Little need be said as to the question which arises under the Fifth Amendment. There is no question, of course, but that the exercise of the bankruptcy power by Congress, as is the case with other delegated powers, is subject to the requirement of due process contained in that amendment. Monongahela Nav. Co. v. U. S., 148 U. S. 312, 336, 13 S. Ct. 622, 37 L. Ed. 463; Hanover Nat. Bank v. Moyses, supra, 186 U. S. 181, 192, 22 S. Ct. 857, 862, 46 L. Ed. 1113. But as any exercise of the bankruptcy power impairs the obligation of contracts, such impairment is not to be taken as in itself a denial of due process. For the provisions of the act to violate the amendment, they must be so grossly arbitrary and unreasonable as to be "incompatible with fundamental law." Hanover Nat. Bank v. Moyses, supra. We do not think that the requirement that secured creditors scale their debts in accordance

with a plan which two-thirds of them are willing to accept and which has been approved by the court as reasonable and fair, and accept in lieu of payment in money such securities as are specified in the plan, can be said to be such an arbitrary and unreasonable exercise of the bankruptcy power as to amount to a denial of due process.

The fact that secured debts are affected by the act does not, of course, raise any grave constitutional question, and can be dismissed with brief comment. "A secured debt or lien is, so far as the Constitution of the United States is concerned, a no more sacred kind of property than an unsecured debt. * * * And the Constitution expressly permits and grants to Congress the exercise of the power to affect such property, whether it be an unsecured debt or whether it be a lien, by laws relating to 'subject of bankruptcies.'" In re Burgh (D. C.) 7 F. Supp. 184, 185.

As a matter of fact, no property in any real sense is taken from the dissenting creditor when he is compelled under section 77B to scale his claim and accept securities in lieu thereof. The securities held by him have already shrunk in value before the proceeding under the act is instituted; and all that is required of him is that he face reality and accept his pro rata interest in the debtor's property in a form which will not jeopardize the rights of other creditors similarly situated. If he were allowed to insist on the foreclosure of the lien in which he is interested in common with others, he would bring serious injury to them without benefit to himself. Under the act, he is merely required to accept what two-thirds of those similarly situated are willing to accept, and what the court has found to be fair and reasonable under the circumstances; and, when the situation is viewed realistically, it is readily seen that he is not required to surrender any part of the value either of his securities or of the property available for the payment of his claim. What he in fact gives up is merely the arbitrary power to frustrate the wishes of the great majority of those who have a common interest in the property of the debtor, or, in other words, the power to demand from other creditors an unconscionable settlement of his claim as the price of withdrawing objection to a plan of reorganization which is fair to all parties concerned.

The act is based upon an equitable recognition of the rights of all who have an interest in a common property, and is in accord with the principle under which courts of equity have denied to dissenting creditors the right to prevent the consummation of a plan of reorganization which has been found to be fair and open to all creditors on the same terms. See Fearon v. Bankers' Trust Co. (C. C. A. 3d) 238 F. 83; Simon v. New Orleans R. Co. (C. C. A. 5th) 242 F. 62. It embodies substantially the principles of corporate reorganization adopted in England and Canada many years ago, and, as shown above, held reasonable by the Supreme Court in the case of Canadian Southern Ry. Co. v. Gebhard, supra, where the court said: "In no just sense do such governmental regulations deprive a person of his property without due process of law."

While the constitutionality of the act in so far as it affects the rights of stockholders would not seem to be here involved, still, as the question of the effect of the act on stockholders has been raised in a number of articles as bearing upon its constitutionality, we have considered that question and find nothing in the provisions of the act relating to stockholders which renders it unconstitutional. If a corporation be insolvent in the bankruptcy sense, i. e. if its liabilities exceed its assets, the rights of stockholders are not affected by the reorganization. If, however, it is insolvent only in the sense that it is unable to pay its debts as they mature, the stockholders are benefited and not injured by the adoption of a plan of reorganization which prevents the sacrifice at forced sales of the property upon which the value of their stock depends. Any plan must be accepted by the holders of a majority of the stock affected as well as approved by the court, or, if the consent of the majority be not obtained, their equity must be fully protected by the court in one of the methods prescribed in the act. The same reasoning which supports the act as applied to creditors supports it also, we think, as applied to stockholders. As has been well said: "While there is no express judicial authority to establish the power of the Court in bankruptcy proceedings to disturb the relation of the debtor's stockholders inter se, it must be considered a very narrow view of the bankruptcy power which does not recognize that such a disturbance is fairly a part of the subject of bankruptcies when it is incidental to a necessary re-arrangement of the relation-

ship between the creditors and their debtor."*1

While the constitutionality of section 77B has not yet been directly passed on, so far as we are advised, by any of the Circuit Courts of Appeals, it has been applied without question as to its constitutionality by the Circuit Court of Appeals of the Tenth Circuit. See Bryan v. Welsh (C. C. A. 10th) 72 F.(2d) 618.*2 And its companion sections, section 74 (11 USCA § 202), relating to the relief of individual debtors, and section 77, the Railroad Reorganization Act (11 USCA § 205), as to both of which substantially the same constitutional questions are involved, have been upheld against constitutional objections by the Circuit Court of Appeals of the Seventh Circuit. In re Landquist, supra; Chicago, R. I. & P. R. Co., 72 F.(2d) 443.

Doubts as to the validity of section 77B are based very largely upon the fact that the relief which it provides for embarrassed corporations, their creditors and stockholders, has not heretofore existed under the laws of this country, and for that reason seems novel and questionable. It must be remembered, however, that the power granted Congress over the subject of bankruptcies is plenary, and that in its exercise Congress is not limited by what has been attempted in the past but may shape its remedies in a way to meet adequately the problems of the present. Like other constitutional grants of power, that giving Congress power over bankruptcies is to be interpreted, not in the light of the conditions with which the framers of the Constitution were familiar, but of what is required under modern conditions to deal adequately with the relationship existing between embarrassed debtors and their creditors. As said by Chief Justice Hughes in Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 442, 54 S. Ct. 231, 242, 78 L. Ed. 413, 88 A. L. R. 1481: "If by the statement that what the Constitution meant at the time of its adoption it means to-day, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning: 'We must never forget that it is a constitution we are expounding' (McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L. Ed. 579); 'a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs.' Id. page 415 of 4 Wheat. When we are dealing with the words of the Constitution, said this Court in Missouri v. Holland, 252 U. S. 416, 433, 40 S. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984, 'we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. * * * The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago.'"

For the reasons stated, we think that section 77B of the Bankruptcy Act is a constitutional and valid enactment, and that there was such acceptance by the bondholders of the plan of reorganization as warranted the court below in entering the order from which appeal was taken. As subdivision (k) of section 77B (11 USCA § 207 (k) provides that proceedings under that section shall be deemed "bankruptcy proceedings" or "proceedings in bankruptcy" and shall be governed by the provisions of the general bankruptcy act when same are not inconsistent with the provisions of the section, and as proceedings in bankruptcy, except in the three cases mentioned in section 25, as amended, 11 USCA § 48, are reviewable only by appeal to superintend and revise under section 24b, as amended, 11 USCA § 47 (b), it follows that the proper method of reviewing the order below was by appeal to superintend and revise under section 24b. The order appealed from will be affirmed, therefore, in No. 3831; and the appeal in No. 3845 will be dismissed.

In No. 3831, affirmed.

In No. 3845, appeal dismissed.

---

*1 See "The New Corporate Reorganization Statute," by David W. Kahn in Journal of National Association of Referees in Bankruptcy, vol. 9, at page 18, and "Federal Legislation for Corporate Reorganization—An Affirmative View," by Robert T. Swaine in Journal American Bar Association, vol. XIX, pp. 698, 701.

*2 Since this opinion was prepared, the Circuit Court of Appeals of the Second Circuit has upheld the constitutionality of section 77B in the case of In re Central Funding Corporation (C. C. A. 2d) 75 F.(2d) 256.