### BRADFORD v. FAHEY et al. (two cases).*
### Nos. 3778, 3797.

Circuit Court of Appeals, Fourth Circuit.
April 2, 1935.

*Judgment reversed on rehearing — F.(2d) —.

Morton P. Fisher and Allan H. Fisher, both of Baltimore, Md. (A. Freeborn Brown, of Bel Air, Md., on the brief), for appellant.

Wade B. Hampton, of Washington, D. C., and Clarence E. Martin, of Martinsburg, W. Va. (Robinson & Fahey, of Bel Air, Md., on the brief), for appellees Michael W. Fahey, assignee, and Potomac Joint Stock Land Bank of Alexandria.

Herbert Levy, of Baltimore, Md. (Morris Rosenberg, of Baltimore, Md., on the brief), for appellees John D. and Annie McC. Worthington.

Edwin A. Krauthoff, of Chicago, Ill., amicus curiæ.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in bankruptcy proceedings from an order denying the prayer of a petition, which was filed under subsection (s) of section 75 of the Bankruptcy Act, as added by Act June 28, 1934 (11 USCA § 203 (s), and which asked that the court enjoin further prosecution of proceedings which had been commenced in the circuit court of Harford county, Md., to foreclose a mortgage on the farm of petitioner. The mortgagee resisted the petition on two grounds: (1) That the court of bankruptcy could not

interfere with the state court's jurisdiction, which had attached in the proceedings to foreclose the mortgage; and (2) that subsection (s) (7) of section 75 of the Bankruptcy Act, as added in 1934 (11 USCA § 203 (s) (7), was unconstitutional and therefore furnished no basis upon which the ultimate relief sought might be granted. The District Judge held against the mortgagee on the first ground, but sustained the second and denied the petition because in his opinion the subsection of the Bankruptcy Act under which the petition was filed was violative of the "due process" clause of the Fifth Amendment. The petitioner has appealed.

There is no dispute as to the facts, which may be briefly stated as follows: On February 6, 1926, the petitioner William W. Bradford, Jr., a farmer of Harford county, Md., executed a mortgage on 145 acres of land to the Potomac Joint Stock Land Bank of Alexandria to secure a debt of $20,000. On April 16, 1934, there was due on the mortgage debt a balance of amortization payments in excess of $1,000 and certain insurance premiums which the mortgagee had advanced; and on that date the mortgagee, acting under the terms of the mortgage, declared the whole debt, amounting to $19,-497.23, to be due, and assigned the mortgage to Michael W. Fahey for the purpose of foreclosure. Fahey proceeded to advertise and sell the mortgaged property under the power contained in the mortgage, docketing the foreclosure proceedings in the circuit court of Harford county, Md., in accordance with the provisions of the Maryland law. The sale was held on June 18, 1934, when John D. Worthington and wife became the last and highest bidders for the property at the price of $21,500 and deposited $2,150 with the assignee to be applied on the purchase price. On June 19th, Fahey reported the sale to the clerk of the court, and the usual order nisi was entered requiring notice to be given that the sale would be confirmed unless cause to the contrary should be shown on or before the 19th day of July. Exceptions to the sale were filed by the petitioner Bradford, but these have not been passed on because of the proceedings taken in this cause.

On July 17th, two days before the order nisi was returnable, Bradford filed his petition in the court below under section 75 of the Bankruptcy Act, alleging that he was a farmer, that he was unable to meet his debts as they matured, and that he desired to effect a composition or extension of his debts as provided by that section. The proceedings in the state court were stayed pursuant to the prayer of the petition, and the case was set for hearing on September 6th. In the meantime answers were filed by Fahey and the Worthingtons and the land bank was made a party. Letters were sent to the various creditors offering a composition, but on the morning of the hearing petitioner was notified that his offer would be refused by the land bank, and, as the debt owing to it was more than the other indebtedness of petitioner, there resulted a failure to obtain such an acceptance of the offer of composition as was required by the section. Petitioner thereupon amended his petition and asked to be adjudicated a bankrupt and granted relief pursuant to subsection (s) of the section and that the foreclosure proceedings in the state court be permanently enjoined. At this time it was formally and definitely stated by counsel for petitioner that he would elect to purchase the property embraced in the land bank's mortgage pursuant to the terms prescribed in subsection (s) and by counsel for the mortgagee that it did and would object thereto. The court approved the petition as properly filed and passed an order adjudicating Bradford a bankrupt, but, being of opinion that paragraph 7 of subsection (s) was unconstitutional, refused to stay proceedings in the state court. The matter complained of on this appeal is this refusal to stay proceedings.

A preliminary question which arises is whether the appeal is not premature, as the right of petitioner to relief under paragraph 7 of subsection (s) of the act would arise only after there had been an appraisal of the property, an offer to purchase at the appraised price and a refusal on the part of the lienholder to accept this offer. But the answer to this is that the appeal is from the refusal to stay proceedings in the state court, and under the provisions of the act, if valid, these proceedings should be stayed while the appraisal and other proceedings preliminary to the right to relief under paragraph 7 are going forward, if the court has jurisdiction to stay such proceedings. Subsection (s) is not an independent statute but an amendment to section 75 as enacted by the Act of March 3, 1933. Under subsections (n) and (o) of that section (11 USCA § 203 (n, o), the property of the farmer wherever situate is subjected to the exclusive jurisdiction of the court of bankruptcy, and it is forbidden that proceedings for

foreclosure of a mortgage thereon be instituted or maintained in any other court without the permission of the court of bankruptcy. Proceedings under subsection (s) are but a continuation of proceedings theretofore instituted under other provisions of the section; and the provisions for staying foreclosure in a state court are clearly applicable for the purpose of protecting the court's jurisdiction while such proceedings are going forward. A denial of the stay on the ground that paragraph 7 of subsection (s) was unconstitutional, after a petition had been filed asking relief under that subsection, was clearly appealable, therefore, irrespective of whether or not the proceedings had gone forward to the point where petitioner was entitled to the relief provided by that paragraph.

With this preliminary question out of the way, three questions are raised for our consideration by the appeal, viz.: (1) Whether subsection (s) of section 75 of the Bankruptcy Act, and particularly paragraph 7 thereof, is a constitutional exercise of the bankruptcy power of Congress; (2) whether a court of bankruptcy has jurisdiction under section 75 of the Bankruptcy Act to stay proceedings for foreclosure of a mortgage already pending in a state court where relief is asked under subsection (s) of the section; and (3) whether this jurisdiction may be exercised with respect to a foreclosure suit in Maryland, where there has been a sale of the mortgaged property under order of court but the sale has not been confirmed. We think that all of these questions must be answered in the affirmative.

The bankruptcy power of Congress is conferred by article 1, § 8, cl. 4 of the Constitution, which provides that Congress shall have power "to establish * * * uniform Laws on the subject of Bankruptcies throughout the United States." It is correlative to the clause of article 1, § 10, which provides that "no State shall * * * pass any * * * Law impairing the Obligation of Contracts." It was realized at the time of the adoption of the Constitution that uniform laws on the subject of bankruptcies were important in the development of interstate and foreign commerce, over which Congress was given control; and not only was Congress vested with the power to establish such uniform laws, but the states were expressly forbidden to exercise the power usually involved in bankruptcy laws, i. e. the power of impairing the obligation of contracts. The subject is dealt with in one

sentence in that great commentary on the Constitution, the Federalist Papers (XLI), where it is said: "The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie, or be removed into different states, that the expediency of it seems not likely to be drawn in question."

■ What is a law on the subject of bankruptcies within the meaning of the Constitution has never received exact definition at the hands of the Supreme Court, but there can be no question, we think, but that the constitutional grant vests in Congress full power to deal with the relationship existing between debtors unable or unwilling to pay their debts and their creditors, and that we may safely say, without attempting to delimit the power, that any law must be held to be a law on the subject of bankruptcies, which provides for the surrender of the property of a debtor to a court, its control and administration by the court with the eventual application of the property or its value to the claims of creditors, and the discharge of the debtor from the remainder of his debts. As we said in the recent case of Campbell v. Alleghany Corporation (C. C. A. 4) 75 F.(2d) 947, which dealt with the validity of the corporate reorganization section of the Bankruptcy Act: "All phases of the relationship between a debtor financially embarrassed and his creditors are brought under the control of Congress by the constitutional grant of power; and the fact that a particular mode has hitherto been employed in dealing with this relationship is not to be taken as a measure of the power over it. Hanover Nat. Bank v. Moyses, 186 U. S. 181, 22 S. Ct. 857, 46 L. Ed. 1113; Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529; In re Landquist (C. C. A. 7) 70 F.(2d) 929, 931; In re Klein, Fed. Cas. No. 7,865, reported as note to Nelson v. Carland, 1 How. 265, 277, 11 L. Ed. 126, 130; In re Reiman, 7 Ben. 455, Fed. Cas. No. 11,673; Kunzler v. Kohaus, 5 Hill [N. Y.] 317."

In Story on the Constitution, § 1113, quoted with approval by Judge, later Mr. Justice, Blatchford, in In re Reiman, supra, it is said: "Perhaps, as satisfactory a description of a bankrupt law as can be framed is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies, in the sense of the consti-

tution, is a law making provisions for cases of persons failing to pay their debts."

And Judge Blatchford in his opinion in the case cited defines the "subject of bankruptcies" as used in the constitutional grant of power as follows: "What is 'the subject of bankruptcies?' It is not, properly, anything less than the subject of the relations between an insolvent or non-paying or fraudulent debtor, and his creditors, extending to his and their relief. It comprises the satisfaction of the debt for a sum less than its amount, with the relief of the debtor from liability for the unpaid balance, and the right of the creditor to require that the amount paid in satisfaction shall be substantially as great a pro rata share of the property possessed by the debtor as it can pay, or can reasonably be expected to pay."

It is clear that the power of Congress over bankruptcies is not limited by the terms of the British and colonial statutes as they existed at the time of the adoption of the Constitution. As was well said by Mr. Justice Hunt, in affirming the decree of Judge Blatchford in the Reiman Case (Fed. Cas. No. 11,675): "The argument, that the subject of bankruptcies is to be interpreted and limited by the British and colonial statutes, as they existed at the time of the separation of this country from Great Britain, is quite too narrow. No country can afford to be thus cut off from all possible improvement in its legislation. Whatever relates to the subject of bankruptcy is within the jurisdiction of congress; and, to say that the law as existing at the time of the Revolution, or the adoption of the constitution, shall furnish the rule and limitation of legislation, would take a large part of the subject out of their jurisdiction. While it is true that all proper bankrupt laws and insolvent laws are based upon the theory of a surrender of the bankrupt's property, none of them require such surrender to be entire and absolute." See, also, opinion of the Supreme Court in Hanover Nat. Bank v. Moyses, supra, and opinion of this Court in Campbell v. Alleghany Corporation, supra.

█ Nor are the limits of the bankruptcy power to be sought in the exercise which Congress has made of that power. Congress made no exercise of the bankruptcy power whatever until 1800 (2 Stat. 19), when an act along the line of the English bankruptcy acts relating to traders was passed, which was repealed, however, in 1803 (2 Stat. 248). The power was again exercised by the passage of an act in 1841 (5 Stat.

440), but this act was repealed in 1843 (5 Stat. 614). In 1867 the third Bankruptcy Act was passed (14 Stat. 517); and it remained in force for only eleven years, being repealed in 1878 (20 Stat. 99). In 1898 the present Bankruptcy Act (11 USCA) was passed. It has been well described (1 Remington on Bankruptcy p. 18) as: "A system of laws for the taking possession of the assets of an insolvent, either upon his own initiative or, in case he has done certain acts called acts of bankruptcy, considered to demonstrate his unworthiness or incapacity properly to continue his business, upon the initiative of his creditors; for recovering such of his assets as have been transferred fraudulently to third parties or unfairly to particular preferred creditors or have been seized by creditors while the debtor was insolvent; for selling the assets and distributing the proceeds equitably amongst his creditors; and finally for granting to him, in case he has surrendered all his assets and disclosed to his creditors in bankruptcy the truth about his business, a discharge from the unpaid deficit of his debts." But not even the act of 1898 fully covered the subject of bankruptcy. It made no adequate provision for extension of time to insolvents, for corporate reorganization, for relief of embarrassed railroad corporations or for relief of agricultural debtors. It was designed primarily for the relief of those whose debts had been incurred in mercantile and manufacturing pursuits and their creditors; and only in this field did it afford relief which could be said to be adequate.

In 1933, however, a much wider exercise of the bankruptcy power on the part of Congress became imperative. The period of industrial expansion which followed the world war witnessed an unprecedented expansion of credit throughout the country. Bonds were issued by both public and private corporations in amounts far beyond any ability on their part to pay in normal times, and private individuals borrowed on real estate mortgages to an extent that had never before been thought possible. This period of prosperity and expansion of credit had been followed by an economic depression world wide in scope, property values had dwindled to a mere fraction of what they had been, and the national income had shrunk to the extent that the payment even of the interest on this vast volume of indebtedness was out of the question. Relief was needed in the form of bankruptcy laws, which would enable the people to face real-

ity with respect to the altered condition of their debt structure and would enable business to go forward unhampered by obligations which were impossible of fulfillment. Congress accordingly passed the amendment of March 3, 1933, to the Bankruptcy Act. 47 Stat. 1467. This amendment added four sections to the act: Section 74 (see 11 US CA § 202), which provided for compositions and extensions by distressed debtors without an adjudication of bankruptcy; section 75 (see 11 USCA § 203), which provided a special plan for the relief of agricultural debtors; section 76 (see 11 USCA § 204), which granted relief to persons secondarily liable on obligations of distressed debtors; and section 77 (11 USCA § 205), which provided for the reorganization of insolvent railroads. Sections 74 and 77, as thus enacted, have been sustained, as a valid exercise of the bankruptcy power. In re Landquist (C. C. A. 7) 70 F.(2d) 929; In re Chicago R. I. & P. R. Co. (C. C. A. 7) 72 F.(2d) 443.

It was soon apparent, however, that the amendments of 1933 did not adequately meet the situation. Something was needed which would enable insolvent corporations and farmers to obtain relief from their debt burdens without forcing a sale of their property, and, in the case of farmers, without putting them off of the land which they had been cultivating to join the army of the destitute and unemployed. Congress accordingly, on June 7, 1934, passed the Corporate Reorganization Act, as section 77B of the Bankruptcy Act (11 USCA § 207), and on June 28, 1934, passed the Frazier-Lemke Act adding subsection (s) to section 75 of the Bankruptcy Act (11 USCA § 203 (s). Both of these acts provide relief in bankruptcy for embarrassed debtors and their creditors under the supervision of the court without requiring a sale of the property of the debtor. We have recently passed upon the Corporate Reorganization Act and have held it valid. Campbell v. Alleghany Corporation, supra.

Both section 75 as originally enacted and the Frazier-Lemke Act, adding subsection (s) thereto, are emergency legislation, enacted to meet the conditions brought about by the economic depression. Subsection (c) of section 75 (11 USCA § 203 (c) limits the time within which petitions may be filed thereunder to five years, and the provisions of subsection (s), the Frazier-Lemke Act, are applicable only to debts existing at the time of its passage. As originally enacted the section provided merely for extensions and compositions for agricultural debtors, when accepted by a majority in number and amount of the claims against them, and when approved by the court as for the best interest of all creditors and as including an equitable and feasible method of liquidation for secured creditors and of financial rehabilitation for the farmer. See subsections (g) and (i), 11 USCA § 203 (g, i). Compositions and extensions thereunder did not "reduce the amount of nor impair the lien of any secured creditor" but affected "only the time and method of its liquidation." Subsection (k), 11 USCA § 203 (k). There can be no question but that under the principles discussed by us in Campbell v. Alleghany Corporation, supra, the section as originally enacted was valid.

Subsection (s), added by the Frazier-Lemke Act, provides for cases where a farmer who has filed a petition under section 75 has failed to obtain the acceptance by creditors of an extension or composition proposal offered, or who may feel aggrieved by the composition or extension as finally approved. Such farmer is authorized to amend his petition or answer so as to ask that he be adjudged a bankrupt. Provision is then made, under paragraphs (1) to (6) of the subsection (11 USCA § 203 (s) (1-6), for the valuation of his property by appraisers, subject to review by the court, and for the purchase by him of all or any part of the property at the valuations so fixed, upon making payments which are spread over a period of six years. As the right of the farmer to purchase the property under these sections is dependent upon the consent of lienholders, and as the lienholder here has not given such consent, the validity of these purchase provisions is not before us. Upon the principles hereafter discussed, however, we see no reason to doubt their validity. Where a secured creditor objects to the sale to the farmer in accordance with these provisions, however, provision is made under paragraph (7) that proceedings be stayed, that the farmer have the right to retain possession of the property for five years upon paying a reasonable annual rental to be fixed by the court, and that he have the right to purchase the property at any time within the five years upon paying the appraised price of the property, with the right on the part of the lienholder to demand a reappraisal of the property and payment of the amount thereof in lieu of the amount of the original appraisal, if it is acceptable to him. Paragraph (1) of the subsection re-

lating to appraisal of the property of the bankrupt and paragraph (7), upon which the rights of the petitioner here depend are as follows:

"(1) Upon such a request being made in the petition or answer, at the time of the first hearing, appraisers shall be designated and appointed. Such appraisers shall appraise all the property of the debtor at its then fair and reasonable value, not necessarily the market value at the time of such appraisal. The appraisals shall be made in all other respects, with right of objections, exceptions, and appeal, in accordance with this Act [title]: Provided, That in case of real estate either party may file objections, exceptions, and appeals within one year from date of order approving the appraisal."

"(7) If any secured creditor of the debtor, affected thereby, shall file written objections to the manner of payments and distribution of debtor's property as herein provided for, then the court, after having set aside the debtor's exemptions as prescribed by the State law, shall stay all proceedings for a period of five years, during which five years the debtor shall retain possession of all or any part of his property, under the control of the court, provided he pays a reasonable rental annually for that part of the property of which he retains possession; the first payment of such rental to be made within six months of the date of the order staying proceedings, such rental to be distributed among the secured and unsecured creditors, as their interests may appear, under the provisions of this Act [title]. At the end of five years, or prior thereto, the debtor may pay into court the appraised price of the property of which he retains possession; Provided, That upon request of any lien holder on real estate the court shall cause a reappraisal of such real estate and the debtor may then pay the reappraised price, if acceptable to the lien holder, into the court, otherwise the original appraisal price shall be paid into court, and thereupon the court shall, by an order, turn over full possession and title of said property to the debtor and he may apply for his discharge as provided for by this Act [title]: Provided, however, That the provisions of this Act [subsection] shall apply only to debts existing at the time this Act becomes effective [June 28, 1934]."

As the paragraphs which we have quoted are amendments of the General Bank-

ruptcy Law, it is clear that the appraisals for which provision is made are to be conducted as are other appraisals in bankruptcy under the supervision and approval of the court, with the added safeguard that, in the case of real estate, objections, exceptions, and appeals may be filed within one year of the order approving the appraisal. The price at which the farmer may purchase the property, therefore, is not some arbitrary figure arrived at by friendly appraisers, as has been argued, but the fair and reasonable value of the property as determined by the court in a judicial proceeding after notice and hearing. The appraisal is to be made of the property "at its then fair and reasonable value, not necessarily the market value at the time of such appraisal." Congress doubtless realized that, as a result of the economic depression, much valuable farm property had little or no market value at the time, and that it would be unfair to creditors to value the property on the basis of its then market value. In arriving at its fair and reasonable value, the appraisers and the court were authorized to take into consideration all the circumstances bearing upon value, not merely the market value at the time of the appraisal, just as a public service commission may consider such circumstances in valuing property for rate making purposes. The cost of the property, the cost of improvements made upon it, its depreciation, its productive capacity, reproduction cost, or the cost of acquiring like property, the history of values in the immediate locality—all of these and other like matters, as well as market value, would be proper subjects of consideration in determining fair and reasonable value. The rule prescribed is eminently fair to creditors, as it is hardly conceivable that a court would approve an appraisal as a fair and reasonable value which was less than market value. And the danger that the farmer might avail himself of the provisions of the act to speculate upon the chances of a rise in the value of the property without obligating himself to purchase it, is obviated by the provision which allows the lienholder to demand a reappraisal. If the farmer elects to purchase, he must pay either the original appraisal or this reappraisal, whichever is higher.

It is of course no ground of constitutional objection that the section here in question relates only to farmers; for it is well settled that the uniformity prescribed

by the Constitution is "geographical and not personal" and that bankruptcy legislation need not apply to all classes of persons in the same way. Hanover Nat. Bank v. Moyses, supra, 186 U. S. 181, 188, 22 S. Ct. 857, 46 L. Ed. 1113; Stellwagen v. Clum, 245 U. S. 605, 613, 38 S. Ct. 215, 62 L. Ed. 507; Leidigh Carriage Co. v. Stengel (C. C. A. 6) 95 F. 637; In re California Pac. Ry. Co., 3 Sawy. 240, Fed. Cas. No. 2,315; Campbell v. Alleghany Corporation, supra. And it does not furnish ground of objection that secured debts are affected, or that property which has been mortgaged by the bankrupt is to be administered by the bankruptcy court. Under the Bankruptcy Law as it existed prior to the recent amendments the court in ordering the sale of the bankrupt's property free of liens administers his encumbered property, as well as that which is unencumbered. See Van Huffel v. Harkelrode, 284 U. S. 225, 227, 52 S. Ct. 115, 76 L. Ed. 256, 78 A. L. R. 453; Federal Land Bank of Baltimore v. Kurtz (C. C. A. 4) 70 F.(2d) 46; Allebach v. Thomas (C. C. A. 4) 16 F.(2d) 853. "A secured debt or lien is, so far as the Constitution of the United States is concerned, a no more sacred kind of property than an unsecured debt. * * * And the Constitution expressly permits and grants to Congress the exercise of the power to affect such property, whether it be an unsecured debt or whether it be a lien, by laws relating to the 'subject of Bankruptcies.'" In re Burgh, 7 F. Supp. 184, 185; Campbell v. Alleghany Corporation, supra.

The case, then, comes to this: Whether the act is to be condemned as not being in fact a law on the subject of bankruptcies or as denying the due process guaranteed by the Fifth Amendment, either because it permits the farmer to purchase the encumbered property at the valuation fixed by the court instead of requiring that it be sold at public auction, with right on the part of the lienholder to bid at the sale, or because it permits a delay of five years, during which the property is to be rented to the farmer, before requiring that the value as determined by the court be collected and distributed to lienholders and other creditors.

■ There can be little doubt as to the law being a law on the subject of bankruptcies within the meaning of those words as used in the Constitution. It applies only to farmers who are unable to pay their debts and ask to be adjudged bankrupt. It requires the surrender of their property into the control of the court of bankruptcy. It provides for the valuation of this property and that such valuation be paid to creditors. It grants to the bankrupt a discharge from his debts. That the property of the bankrupt is to be operated under the direction of the court until such time as it can be disposed of to advantage, is, of course, not inconsistent with the purposes of a bankruptcy act; and there is nothing in the nature of bankruptcy which requires that the debtor's property be actually sold and the proceeds thereof distributed among creditors. If the creditors receive the value of the property, they have received all to which they are reasonably entitled. The corporate reorganization act rests on this basis; and there is no reason why Congress should not apply the same principles to the relief of insolvent farmers. See discussion of this question as applied to corporate reorganization in Campbell v. Alleghany Corporation, supra.

■ Of course, a bankruptcy law must not offend against the due process clause of the Fifth Amendment, which is a limitation upon all of the powers conferred by the people upon the federal government. Hanover Nat. Bank v. Moyses, supra. But as any exercise of the bankruptcy power impairs the obligation of contracts, such impairment is not to be taken as in itself a denial of due process. For the provisions of the act to violate the amendment, they must be so grossly arbitrary and unreasonable as to be "incompatible with fundamental law"; and, when consideration is given to the situation which confronted Congress at the time of the passage of the act, we do not think that its provisions can be said to violate this rule. The situation, which still continues in large measure, was that agriculture throughout the United States was prostrate and dispairing. A huge volume of debt, estimated at between eight and nine billions of dollars, had been piled up by the farmers in the period of expansion, and this was represented in large part by mortgages on land. As a result of the decline in the prices of agricultural products, the farmers were without means to pay even the interest on this huge volume of debt, and there was default throughout the country on agricultural mortgages. Foreclosures on an unprecedented scale were imminent; but such foreclosures, while fraught with ruin to the farmer debtors, would not have resulted in payment of the debts, as land had so declined in value that only in rare instances could

it be sold for anything like the amount of the debt against it. To have permitted these foreclosures to proceed would have meant the purchasing of the land by the lienholders, the eviction of owners who were settled on the land and a great increase in tenant farming. It was in the public interest that the farmer be kept on his farm, that, if possible, his interest as an owner of the farm be maintained, and that its value as a going concern be preserved.

██ It was to meet this emergency situation that the statute in question was enacted. The interests of the creditor were protected by having the property valued under the direction and subject to the approval of the court, and by providing that the creditor should ultimately receive this valuation. The farmer was kept on the farm and its value as a going concern was preserved by providing that it should be rented to the owner at a rental to be fixed by the court, and that he should have the right to purchase it at the fair and reasonable value which the court should determine.

The operation of mortgaged property under the control of the court is, of course, nothing new. It is a common thing for foreclosure proceedings to be delayed while the court operates the property of debtor corporations for the purpose of preserving its going concern value in the interest of stockholders as well as creditors until a sale can be advantageously made; and it should not be held "so grossly arbitrary and unreasonable as to be incompatible with fundamental law" that Congress, when faced with a great economic emergency, has prescribed for the relief of agricultural debtors and their creditors, a procedure which involves the operation of agricultural property under the supervision of the court to the end that its value may be preserved in the interest of all parties concerned. The fact that the court is to rent the property, instead of operating it through a receiver, is a difference of detail in management and not a difference in principle.

And the right, accorded the farmer, to purchase at the valuation fixed by the court, is no more than the right accorded the debtor under the corporate reorganization act which we have upheld. If the creditor receives the value of the property, it is no concern of his who the purchaser may be; and as we have seen, the act provides for the determination of value by the court in a judicial proceeding in which the creditor is given full opportunity to be heard.

As a matter of fact, no property in any real sense is taken from the lienholder by reason of the provisions of the act. The mortgaged property has already shrunk in value before the proceedings under the act are instituted; and the proceedings merely scale down the secured portion of the debt to the value of the encumbered property and transfer the lien of the encumbrance to the proceeds of that property when paid into court. While the lienholder is delayed in getting his money, the delay is probably not for so long a time, or the loss so great, as would result to him if the act were not passed and wholesale foreclosures of real estate mortgages should result. While generally regarded as a measure for the relief of farmer debtors, it is clear that the act is at the same time one in the interest of their creditors also; for creditors of farmers would have nothing to gain, even with respect to the collection of their debts, from the financial debacle which would result from the wholesale foreclosure of farm mortgages, in which their collateral would be rendered practically worthless. In this connection, it may not be amiss to consider the closing paragraphs of the report of the Senate Judiciary Committee, reporting on the act. (Report No. 1215, 73d Congress, 2d Session). They are as follows:

"In short, all that this amendment does is to carry out the purpose of section 75 and adjust and scale down existing farm indebtedness to the present value of his property, and it gives the debtor farmer an opportunity to save his home and maintain his property by paying for it on the installment plan while the property remains under the control of the court. Section 75 itself is an emergency act and has only about 3½ years to run. Therefore this amendment will cease to exist when the time limit of section 75 expires.

"This amendment will make it possible for the Federal Farm Credit Administration, through the Federal land banks, to function by adjusting and scaling down the indebtedness to somewhere within the reasonable value of the property. This amendment in no way affects existing liens or encumbrances except that it scales them down to the present value of the encumbered property, and then transfers the lien or liens to the proceeds of that property when paid into court.

"On the average, under its provisions, the lienholders and creditors of the debtor farmer, on a whole, will receive unquestionably larger returns than under the present system where the property is thrown upon the market and sold at public auction. It gives a reasonable time and gives the original owner an opportunity to protect his property, and therefore his home."

If the states, as has been held in Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 235, 78 L. Ed. 413, 88 A. L. R. 1481, may in times of emergency exercise their police power to grant a moratorium against the foreclosure of mortgages, notwithstanding the limitations of the contract clause of the Constitution, then certainly Congress, which has been given express power upon the subject of bankruptcies, may exercise that power in the enactment of bankruptcy laws designed to meet the emergency, even though the exercise may delay the collection of the debts due by the bankrupt. As has been often said, the bankruptcy power, like the other powers granted to the federal government, is plenary. It is to be used, as are the other granted powers, to "promote the general welfare." And in times of emergency it should be exercised, reasonably of course and in the spirit of the Constitution, but in a way, if possible, to meet the problems of the emergency. As said by the Chief Justice in the Blaisdell Case: "While emergency does not create power, emergency may furnish the occasion for the exercise of power. 'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.' Wilson v. New, 243 U. S. 332, 348, 37 S. Ct. 298, 302, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024. The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions."

The most serious question presented is as to the five year delay which the statute interposes to the rights of the creditor. It may be conceded that under ordinary conditions, this provision would be so arbitrary and unreasonable as to offend against the provisions of the Fifth Amendment; but we are not prepared to say that it may be so condemned when viewed in the light of the emergency which confronted Congress.

Whether after the economic depression shall have passed and conditions shall have returned to normal the act can be sustained, is a question which is not before us; but the law is well settled that "it is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends." Home Building & Loan Association v. Blaisdell, supra, 290 U S. 398, 442, 54 S. Ct. 231, 241, 78 L. Ed. 413, 88 A. L. R. 1481; Chastleton Corp. v. Sinclair, 264 U. S. 543, 547, 548, 44 S. Ct. 405, 68 L. Ed. 841.

The act in question has been upheld as constitutional by the Circuit Court of Appeals of the Sixth Circuit in Louisville Joint Stock Land Bank v. Radford (C. C. A. 6) 74 F.(2d) 576; by Judge Dawson in the same case in the District Court In re Radford, 8 F. Supp. 489; by Judge Symes in In re Cope (D. C.) 8 F. Supp. 778; and by Judge Atwell in Paine v. Capitol Freehold Land Co. (D. C.) 8 F. Supp. 500.

We come then to the question as to whether the court of bankruptcy had jurisdiction to stay proceedings for foreclosure of a mortgage already pending in a state court; and it is clear that prior to the enactment of the amendment of March 3, 1933, it had no such power. Straton v. New, 283 U. S. 318, 51 S. Ct. 465, 75 L. Ed. 1060; In re Hurlock (D. C.) 23 F.(2d) 500. This was because the jurisdiction of the state court and the bankruptcy court in matters of foreclosure was concurrent, and on principles of comity the bankruptcy court would not attempt to interfere with the jurisdiction of the state court. Under subsection (n) of section 75 (11 USCA § 203 (n), however, the bankruptcy court was given exclusive jurisdiction over the property of the farmer debtor; and under subsection (o) (11 USCA § 203 (o) it was expressly provided that proceedings for the foreclosure of mortgages should not be instituted, or, if instituted prior to the filing of the petition, should not be maintained. Under such circumstances there can be no question but that the jurisdiction of the bankruptcy court over the property was paramount and exclusive, and that it was the duty of the court to protect this jurisdiction by injunction or other appropriate process. In such case the power of the court is analogous to that which it possesses where the property of the bankrupt is in possession of the receiver of a state court appointed within four months of

638

the filing of the petition in bankruptcy. See In re Watts, 190 U. S. 1, 23 S. Ct. 718, 47 L. Ed. 933; Bailey v. Blackmon (C. C. A. 4) 14 F.(2d) 16, 19, 20; Gamble v. Daniel (C. C. A. 8) 39 F.(2d) 447; Miller v. Potts (C. C. A. 6) 26 F.(2d) 851.

■ It is argued that the power of the court of bankruptcy to stay proceedings ended with the rejection of the proposition for composition or extension submitted under section 75 as originally enacted. This, however, fails to take account of the fact that subsection (s), the Frazier-Lemke Act, is a mere addition to section 75 of the Bankruptcy Act, and that the procedure provided for thereunder is merely a continuation of the procedure which must be begun under other subsections of section 75. For the court to afford the relief which the section as amended contemplates, it is necessary that the exclusive and paramount jurisdiction of the court over the property of the bankrupt be maintained; and there can be no question but that the provisions of subsections (n) and (o) apply as well to proceedings continued under subsection (s) as to proceedings under the other provisions of section 75.

■ And we do not think that the right to stay proceedings in the state court is precluded because a sale has taken place in foreclosure proceedings if there has been no confirmation of the sale. Of course, where the property of the bankrupt has finally passed from him under a foreclosure proceeding, the bankruptcy court has no power over it; for the bankruptcy court is given jurisdiction only over property of the bankrupt, and, when he has ceased to have an interest in the property as the result of foreclosure, no basis exists for a stay of proceedings under the act. In re Arend (D. C.) 8 F. Supp. 211, 212; In re Klein (D. C.) 9 F. Supp. 57, 59; In re Stacy (D. C.) 9 F. Supp. 61; In re Smith (D. C.) 7 F. Supp. 863. Under the law of Maryland, however, the defendant in foreclosure does not lose his interest in the property sold at foreclosure sale until the same is confirmed and the purchase money paid. It is provided by the Maryland Code (article 66, § 11) that "all such sales, when confirmed by the court and the purchase money is paid, shall pass all the title which the mortgagor had in the said mortgaged premises at the time of the recording of the mortgage." Until confirmation and payment of the purchase money, the property is still in the mortgagor and the only interest acquired by the purchaser is the right to receive a conveyance upon complying with the terms of sale if the sale be confirmed. In the latest case dealing with the subject, Mizen v. Thomas, 156 Md. 313, 144 A. 479, 483, the Court of Appeals of Maryland said: "It is true that where, in such a case as this, the trustee reports a sale which in due course is finally ratified, the transaction is spoken of as a sale, and for many purposes it may be treated as a sale, and no mischief is occasioned by that use of the word. Miller's Equity Proc. § 512. But strictly speaking, it is not a sale, for a sale of real estate is not complete or consummate until the property has been actually conveyed, or at least until the purchaser has so far complied with the terms of sale as to entitle him to a conveyance. The bid of the purchaser, its acceptance, the report of the trustee, and its final ratification by the court, are all successive steps in the formation and completion of a perfect and binding contract of sale, but do not amount in themselves to an actual sale. Nor can the property be treated as actually sold until the terms of sale have been met or waived and the purchaser has received or is entitled to receive a conveyance thereof; for until then the title to the property is still in the mortgagor, and the only interest acquired by the purchaser is the right to receive a conveyance of the property upon complying with the terms of sale."

While there are some expressions to the contrary in the opinion in Union Trust Co. v. Biggs, 153 Md. 50, 137 A. 509, that case merely decided that a judgment against the defendant in foreclosure, rendered after the sale but before its confirmation, did not constitute a lien upon the property sold; and it is to be interpreted, in our opinion, as relating the effect of the confirmation to the date of the sale, rather than as changing the well settled rule as to the effect of judicial sales on the rights of the parties prior to confirmation. See Whiteley v. Whiteley, 117 Md. 538, 544, 84 A. 68; Loft, Inc., v. Seymer, 148 Md. 638, 645, 129 A. 911. But at all events, the decision in Mizen v. Thomas, supra, is the latest expression of the Maryland court and we accept it as laying down the rule now in force in that state.

■ As the bankrupt had not lost his rights in the mortgaged property as a result of the unconfirmed foreclosure sale, we think that

the foreclosure proceedings should have been stayed. The statute is highly remedial in character and should be liberally construed. The evident purpose of Congress was to grant to farmer debtors the relief which it prescribes in all cases where an interest in their property remained in them at the time of the filing of petitions under the act. See Paine v. Capitol Freehold & Land Co. (D. C.) 8 F. Supp. 500; In re Lowman (D. C.) 8 F. Supp. 886; In re Cope, 8 F. Supp. 961; In re Miner (D. C.) 9 F. Supp. 1; In re Duffy (D. C.) 9 F. Supp. 166, 169. As said by Judge Lindley in the case last cited: "Viewing the bankruptcy amendment in connection with the remaining sections of the Bankruptcy Act and the recent amendments thereto, it seems to me evident that Congress intended to reach every kind of property interest or property right which the bankrupt then had, including rights to redeem; that Congress intended that the bankrupt should have an opportunity to preserve the then existing status of foreclosure or other insolvency proceedings until it can be determined whether any rehabilitation for the bankrupt is possible. The motive was to prevent completion of immediate foreclosures and execution sales until it should become evident that rehabilitation is impossible. This does not mean that Congress has said that mortgages shall not be enforced. It does not mean that liberty of contracts shall be interfered with or property confiscated, but it does mean that the court, within its jurisdiction and within the limits announced by the Supreme Court in the recent case of Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481, will preserve the existing status of property rights of the bankrupt until convinced that no good purpose is being served by so doing."

For the reason stated, we think the learned judge below erred in denying the prayer of the petition for stay of proceedings in the state court. The order appealed from will accordingly be reversed and the case will be remanded for further proceedings not inconsistent with this opinion. As appeal to superintend and revise under section 24b of the Bankruptcy Act, as amended by Act May 27, 1926 (11 USCA § 47 (b) is the proper method of review, the order appealed from will be reversed in No. 3778, and the appeal in No. 3797 will be dismissed.

In No. 3778, reversed.

In No. 3797, appeal dismissed.