In re Bethol Paulette **BARTO**, Debtor.

**SECURITY PACIFIC FINANCE CORPORATION, Plaintiff,**

v.

**Bethol Paulette BARTO, Defendant,**

**United States of America, Intervenor.**

**Since the Barto case was taken under advisement by the Court, the identical issue has arisen in other cases and the parties therein agreed to let the Barto decision be dispositive of them all. Those cases are**

In re Clifton L. **ANDREWS**, Debtor.

In re Danny Clarence **FARLEY**, Debtor.

In re Linda Whitehurst **LASSITER**, Debtor.

In re Anna Louise **FARLEY**, Debtor.

In re Deborah Ann Small **PALAIMO**, Debtor.

In re Helen Delores Smith **TYNES**, Debtor.

**Nos. 80–00289, 80–00346, 80–00356, 80–00586, 80–00660, 80–02084 and 80–02400.**

**Adv. Proceeding No. 800539.**

United States Bankruptcy Court, E. D. Virginia, Norfolk Division.

Jan. 7, 1981.

George H. Heilig, Jr. of Rixey, Heilig & McKenry, Norfolk, Va., for Sec. Pac. Finance Corp.

Ronald J. Berg of Berg & Gordon, Virginia Beach, Va., for debtor.

Barbara G. O'Connor, Washington, D. C., Staff Atty. for the Executive Office for the U. S. Trustee, U. S., intervenors.

HAL J. BENNEY, Jr., Bankruptcy Judge.

An entirely new and now highly controversial feature was placed in the Bankruptcy Code which did not appear in the prior Act. It is section 522(f), 11 U.S.C. 522(f). Its provisions would permit a debtor to avoid a non-possessory, non-purchase money security interest in certain exempt household goods.

When Barto, the debtor here, borrowed money on November 7, 1978 from Security Pacific Finance Corporation, as collateral she was required to give Security Pacific a lien in almost all she had, including the household goods. Barto now seeks to avoid this lien pursuant to section 522(f), but Security Pacific objects arguing that said section is unconstitutional in that it deprives it of property without due process of law.

█ The legislative history of § 522(f) makes it clear that the section was drafted to protect a debtor's exemptions. Congress thought creditors, by virtue of their vastly greater experience in the lending industry, enjoy a substantial advantage over the average consumer debtor. In lending money, creditors often take a blanket security interest in all of a debtor's personal property, which is typically comprised of household goods, furnishings and appliances. Experience indicates that this type of property has, at best, nominal resale value. However, the replacement cost of the property may be disproportionately, even disastrously, high and debtors were often coerced into paying the lienholder irrespective of bankruptcy. The policy of Congress to afford a debtor a fresh start was thwarted because some creditors took unfair advantage of consumer debtors and abused the blanket

security interest. H.R.Rep.No.95–595, 95th Cong., 1st Sess. (1977) 126–27, U.S.Code Cong. & Admin.News 1978, p. 5787; 124 Cong.Rec.H. 11,095 (September 28, 1978); S. 17,412 (October 6, 1978).

To prevent this abuse and to foster the fresh start of the debtor, Congress enacted section 522(f). Adversely effected by the section, various creditors have challenged it as an unconstitutional deprivation of property without due process of law in contravention of the Fifth Amendment to the United States Constitution.

### (A) The Bankruptcy Power

The Constitution provides that the Congress shall have the power to establish uniform laws on the subject of bankruptcies throughout the United States. Unfortunately, the term "subject of bankruptcies" is nowhere defined in that document and its precise meaning is, therefore, somewhat ambiguous.

From the earliest days of the Republic it was recognized that the bankruptcy power is intimately related to the commerce power. At the least, it is clear that a judicious use of the bankruptcy power facilitates a more orderly commercial relationship between the various actors in the marketplace. However, the grant of the bankruptcy power is not included in the same clause of the Constitution, although the two are clearly interrelated. This disparity has caused some commentators [e. g. Collier on Bankruptcy, 14th ed.] to conclude that the draftsmen did not intend to restrict the bankruptcy grant as had been the case with the commerce clause. It is argued that the Congress was to have an all-inclusive power to enact legislation reasonably related to the subject of bankruptcies.

█ The Courts have consistently held that the power of Congress to enact uniform bankruptcy legislation is plenary and not limited to past forms of such legislation either as enacted by Congress or in England prior to the adoption of the Constitution. *Wright v. Union Central Life Insurance Co.,* 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490

(1938), reh. den. 305 U.S. 668, 59 S.Ct. 56, 83 L.Ed. 434 (1938); *Campbell v. Alleghany Corporation*, 75 F.2d 947 (4th Cir. 1935), cert. den. 296 U.S. 581, 56 S.Ct. 92, 80 L.Ed. 411 (1935); *Bradford v. Fahey*, 76 F.2d 628 (4th Cir. 1935); *Coin Machine Acceptance Corp. v. O'Donnell*, 192 F.2d 773 (4th Cir. 1951). The Congressional power relative to bankruptcies is a flexible tool which can be utilized to meet the exigencies of the contemporary economic environment.

In the past Congress has 'radically' altered the nature of bankruptcy law on at least several occasions. For example, the Act of 1841 opened voluntary proceedings to all debtors. This was unsuccessfully attacked as unconstitutional. Since that time voluntary proceedings have become, by far, the norm rather than the exception. Another example may be found in the Chandler Act [Bankruptcy Act of 1938] which substituted Chapters X, XI, XII, XIII, XIV for the composition and extension and corporate reorganization provisions of the Bankruptcy Act of 1898. The nefarious "cram-down" provisions appeared as a result of that legislation and were unsuccessfully challenged. See e. g., *In re Pine Gate Associates, Ltd.*, 2 B.C.D. 1478 (N.D.Ga. 1978) and cases cited therein.

As stated above, the courts have consistently expanded the conceptual scope of the bankruptcy power. In fact, the Supreme Court has found the exercise of the bankruptcy power beyond the Constitutional grant on only one occasion—*Ashton v. Cameron County Water Improvement Dist. No. One*, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309 (1936).

In *Ashton*, the Supreme Court analyzed section 80 of the May 24, 1934, amendments to the Bankruptcy Act of 1898. 11 U.S.C. 303. Section 80 provided the mode and conditions under which a municipality or other political subdivision of any State unable to pay its debts could effect a readjustment. The Supreme Court found this legislation an unconstitutional incursion into the affairs of the state and thus beyond the scope of the bankruptcy power. In a clear expression of deference to and concern for the federal system, the Court held that the right of a state to control its fiscal affairs could not be abrogated by congressional mandate.

Since it is the only case holding that Congress had exceeded the scope of the bankruptcy power, several observations relative to Ashton are appropriate. Chapter XI of the Bankruptcy Act was subsequently drafted. Congress was especially careful to avoid the objection that the exercise of the federal bankruptcy power encroached upon the sovereignty of the states. See *United States v. Bekins*, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938). Too, the Congress has consistently afforded maximum flexibility for the states in solving the debt problems of their subdivisions and solutions short of the drastic remedy of bankruptcy are encouraged. *Cf. National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

Except for *Ashton*, the case law is devoid of any example of the Congress overstepping its authority relative to the subject of bankruptcies. Thus, although the parameters of the power are neither spelled out in the Constitution nor specifically delineated by the case law, it is clear that Congress has extremely broad power in the realm of bankruptcy legislation. Given the predilection of the Courts and the historical expansion of the power, conceptually and legislatively, the conclusion [all other things being equal] must be that the legislation is within the scope of the constitutional grant. Even a superficial analysis shows that protecting the debtor's fresh start certainly relates to the subject of bankruptcies.

(B) Due Process Considerations

The great substantive powers of Congress are all subject in their operation to the guaranties of due process contained in the Fifth Amendment. Despite the extensive scope of the Congressional powers over bankruptcy, its exercise is nevertheless subject to the strictures of the Fifth Amendment. *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), reh. den. 296 U.S. 611

(1935); *Kuehner v. Irving Trust Co.,* 299 U.S. 455, 57 S.Ct. 298, 81 L.Ed. 340 (1937); *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke,* 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937).

■ The guaranty of due process of law is one of the most important to be found in the Federal Constitution. It is certainly central in the principle of ordered justice and is essential to the basic American concept of private property. The due process clause protects property rights by making it impossible for the government to take or destroy property without just recompense.

A wealth of case law has made it abundantly clear that Congress may legitimately alter or impair contractual obligations in the exercise of its bankruptcy power. *Wright v. Union Central Life Insurance Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), reh. den. 312 U.S. 711, 61 S.Ct. 445, 85 L.Ed. 1142 (1941); *Continental Illinois National Bank & Trust Co. of Chicago v. Chicago, Rock Island & Pacific Railway Company,* 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1934); *United States National Bank of Omaha, Nebraska v. Pamp,* 83 F.2d 493 (8th Cir. 1936); *Brockett v. Winkle Terra Cotta Co.,* 81 F.2d 949 (8th Cir. 1936); *In re Garcia,* 396 F.Supp. 518 (C.D.Cal.1974). It is the especial purpose of all bankruptcy legislation to interfere with the relationship between the parties concerned—to change, modify, or impair the obligation of their contracts. *Ashton v. Cameron County Water Improvement District No. One, supra.*

If it were simply a question of altering the contractual relationship between the parties, the inquiry could end at this point. However, in this case the creditor has more than an ordinary contract with the debtor; in the course of the relationship, the creditor perfected a security interest in certain property of the debtor. This additional fact gives rise to extremely difficult legal and analytical problems.

The problem alluded to begins in the case of *Louisville Joint Stock Land Bank v. Radford, supra.* In *Radford* the Court found the Frazier-Lemke Act unconstitutional be-cause its avowed object was "to scale down the indebtedness to the present value of the property as well as deprive the mortgagee of certain rights recognized by state law." While it is true, as the government correctly notes, that the Supreme Court has narrowed the holding in the *Radford* case, it has never, never, departed from one fundamental premise implicit in that case—the creditor is to be protected to the extent of the value of his security.

The above is a premise which permeates all contemporary bankruptcy law. All of the cases cited by the government in brief [*Wright v. Union Central Life Insurance Co., supra; John Hancock Mutual Life Insurance Co. v. Bartels,* 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176 (1939); *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke, supra.*] clearly discuss the fact that the creditor is protected to the extent of the value of its security. The courts have not addressed the question presented by the instant case.

Further, the concept saturates the Bankruptcy Code. See Title 11, U.S.C., sections 361 [adequate protection]; 506(a) [determination of secured status]; 1129(b)(1) [Chapter 11 "cram-down"]; 1322(b)(2) [the Chapter 13 cram-down]. All of these Code sections afford protection to the creditor to the extent of the value of its security.

Simply put, this issue becomes one of differentiating between contract and property interest. A realistic analysis of the problem immediately reveals that the type of security interest here in question has aspects of both contract and property rights. It is futile to attempt to draw an ad hoc distinction between the two; both terms represent legal conclusions which flow from the context in which they are used and not from precise analysis.

From the terms and context of its brief, it is apparent that the government is, at least implicitly, aware of the problem of attempting to classify the liens in question as "contract" or "property." At one point the government argues that the Congress may impair contract rights through the ex-

ercise of its bankruptcy power. [pp. 35–37] At another point in the brief [pp. 23–5] the government argues that this is no 'taking' of property by virtue of the operation of the statute. If the lien in question affords the creditor contract rights [which it obviously does] and property rights [this is equally clear; the liens are enforceable in a non-bankruptcy context], then, the strictures of the Fifth Amendment apply.

Recognizing that it is on the horns of a dilemma, the government argues that there is no 'taking' of property in this case. Citing the *Legal Tender Cases,* 79 U.S. 457, 20 L.Ed. 287 (1870), the government states a taking arises only in the case of a direct expropriation. Retreating quickly from this exposed position the government goes on to argue that the Supreme Court has upheld regulations even where its impact on the owner is extremely severe. [p. 24] The point is somewhat obscure and even the case of *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), where the Supreme Court permitted the destruction of unharmed trees in order to prevent the spread of a blight, is easily distinguishable on its facts. The other cases cited do not address the issue of wholesale abrogation of property interest.

Although Congress has exercised power which it clearly has in furtherance of a permitted, perhaps even laudable, purpose, it has probably gone too far if the statute is applied retroactively. Essentially, the question is whether Congress may unilaterally destroy a property right regardless of the purpose of the legislation.

The above discussion purposely took a harsh line to delineate the problems presented by the constitutional challenge to the statute. More specifically, it is the application of the statute which is in question.

If the question were whether or not the statute could pass constitutional muster if applied prospectively only, there would be no problem—as stated previously, Congress has the power to enact the legislation in question.

■ It is the Court's opinion that the statute should be applied to avoid security interest created on or after November 6, 1978, the day the Bankruptcy Act of 1978 was signed into law. This interpretation has at least several factors in its favor.

First, the interpretation does not challenge the constitutionality of the statute. It is axiomatic that federal courts should construe statutes to avoid constitutional questions. *Palmore v. Superior Court of the District of Columbia,* 515 F.2d 1294 (D.C.Cir.1975); *King's Garden, Inc. v. F. C. C.,* 498 F.2d 51 (D.C.Cir.1974).

One may question relative to the date— why the date of signing rather than the date the legislation became effective? As noted above, the Congress was very concerned with preserving the debtor's fresh start and protecting debtors from overreaching creditors. After November 6, 1978, creditors were on notice that nonpossessory, nonpurchase-money security interests were not valid if bankruptcy transpired. So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with the previously acquired rights does not affect it. Were it otherwise, the paramount powers of Congress could be nullified by prophetic discernment. The constitutional provision conferring upon Congress the power to legislate on the subject of bankruptcies is read into contracts as constituting a part thereof. *Wright v. Union Central Life Insurance Co., supra; Fleming v. Rhodes,* 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947); *Tepper v. Chichester,* 285 F.2d 309 (9th Cir. 1960).

Then why not apply the statute retroactively to contracts entered into prior to November 6, 1978? Two reasons come immediately to mind.

First, it is important to note that bankruptcy courts are essentially courts of equity, sitting to apply the principles and rules of equity jurisprudence. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *Braddy v. Randolph,* 352 F.2d 80 (4th Cir. 1965). Sim-

ply put, it is unfair to retroactively abrogate a security interest on the facts of the present case. However, this fact standing alone would not be enough—it is equally unfair to discharge the debtor from obligations to the butcher, the doctor and the bank.

It is important to note that the statute enters the fuzzy area of demarcation between 'contract' and 'property' rights. In this case a retroactive abrogation of the creditor's rights may be subject to severe constitutional infirmities. One may blithely say that the creditor is only losing a contract right by the lien avoidance; it is well-nigh impossible to distinguish this right from a property right. Essentially the interpretation urged here would sidestep these issues and still effectuate the manifest intent of Congress. The Court certainly has the power to apply the statute in the manner urged.

Further, the argument of the United States relative to a retroactive application of the statute is strained at best. Approximately eight pages of argument is devoted to this point. Irrespective of the axioms of statutory construction presented in the argument or the fact that Congress has in the past declared when the provisions of the bankruptcy law are not to be applied to pre-existing contracts, it is imperative to recall that the statute in question is a radical departure from the heretofore accepted forms of substantive bankruptcy law—a creditor has never been forced to surrender its security in return for absolutely nothing before. Again the nagging question of property interest comes into the analysis. It would have been a simple matter for the Congress to make its intent clear; a sentence would have sufficed. Because Congress was silent on the point, one should not assume that the silence is a manifestation of intent.

 A final point must be addressed. Creditors have recently argued that section 522(f) should not be applied in Virginia because the Virginia legislature elected to 'opt-out' of the Federal exemption scheme. It is almost beyond belief that this argument should carry any weight; one would expect it to be dismissed as sheer fancy.

The supremacy of the bankruptcy laws of the United States has never been seriously questioned. See e. g., *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 2 L.Ed. 304 (1805); *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *International Shoe Co. v. Pinkus*, 278 U.S. 261, 49 S.Ct. 108, 73 L.Ed. 318 (1929). On this basis alone a conflicting state law or policy should not hold sway. There is, however, a simpler, more direct argument.

§ 34–31 Code of Virginia, as amended, 1979, is entitled "Property Specified in the Bankruptcy Reform Act nor exempt." Specifically

"No individual may except from property of the estate in any bankruptcy proceeding the property specified in subsection (d) of § 522 of the Bankruptcy Reform Act (Public Law 95–598), except as otherwise may be expressly permitted under this title."

From the above it is clear that Virginia has opted out of section 522(d) ONLY. The Virginia Code does not speak of section 522(f); a reference to that section is nowhere to be found. Section 522 should be read with section 522(d) deleted, but section 522(f) remains.

### Conclusion

The issue presented by the instant case, to be sure, is a close one. The nature of the interest created by the lien is ephemeral and virtually impossible to classify in a distinct pigeon-hole. Congressional power over the subject of bankruptcies must be rationally balanced against the restraints upon the exercise of that power, the historical premises of substantive bankruptcy law and notions of fairness to all of the actors in the drama.

The Court finds for the secured creditor on the law, but it loses on the facts since

the lien apparently attached [1] on the date of the loan, November 7, 1978, after the November 6th line of demarcation established here.

The Court would hasten to add in what is not merely dictum that all of this must be placed in the context of a burning question: Is there anything upon which such a lien can attach? (1) If at the time of bankruptcy there were no prior liens upon any or all of the subject property, such liens as these hold their force and effect to the extent of the security. (2) If other liens come ahead of these to the extent of the property's value, the liens die with the discharged debt. They may not be "saved" until after bankruptcy when the prior liens have in some manner been satisfied.

IT IS SO ORDERED.

---

1. Since the issue has not been raised by any party, it is assumed that Security Pacific has a perfected lien. Other than the date of the loan as reflected on the copy of the security agreement attached to the proof of claim, there is no indication in the record of perfection.